# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS – DALLAS DIVISION

FILED-USDC-NDTX-DA
'25 JUL 30 PM3:02

| | | |
|---|---|---|
| DONALD W. KLEIN, Individually, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. _____ |
| VELANOS PRINCIPAL CAPITAL INC.; | § | |
| NORDIC TRUST ALLIANCE KB; | § | |
| JAMES WILLIAM BYRD; | § | |
| DANIEL FERNANDEZ ROJO FILHO; | § | **3-25CV1991-S** |
| ESTATE OF JAMES WILLIAM BYRD; | § | |
| JOSHUA WEARMOUTH | § | |
| LYNDA K BYRD, Successor-in-Interest, | § | |
| LYNDA K. BYRD, Individually, | § | |
| Defendants. | § | |

## PLAINTIFF'S EXHIBIT INDEX

| Exhibit | Title / Description |
|---|---|
| A | Refund Demand Letter (3/4/24) |
| B | April 25 Wire Record |
| B-1 | Wire Transfer Confirmation (Nova Scotia Bank SWIFT) |
| B2 | Cross-Border Transfer from Velanos to Nordic Trust |
| C | NTA Fee Withdrawals |
| D | Joint Venture / SBLC Agreement (April 24, 2023) |
| E | Hantash v. Byrd, No. 3:24-cv-02392-D (N.D. Tex.) – TRO & Docket Entries |
| E-1 | Hantash v. Byrd – Complaint and Wire Evidence |
| F | Collin County Probate Records – Estate of James W. Byrd |

| Exhibit | Title / Description |
|---------|---------------------|
| G | Genie Investments NV v. Wearmouth, No. 6:23-cv-00312 (M.D. Fla.) Docket |
| G-1 | Genie Complaint |
| H | Declaration of Donald W. Klein (TRO Supporting Facts) |
| I | Affidavit Affirming No Use of AI in Drafting or Filing |

All exhibits are true and correct copies.

## EXHIBIT A

**Demand Letter to Velanos & Nordic (March 4, 2024)**

*Description:* Formal demand for return of Plaintiff's $1,000,000 wire, plus accrued interest and damages. Shows pre-suit notice and Defendants' refusal to cure.



# DW KLEIN & CO.
### FUNDING CAPITAL LENDING

**DW Klein & Co., Corporation**
10380 Foutch Rd.
Pilot Point, Texas 76258
dk@dwklein.com
469.237.7744

**March 4, 2024**

**Velanos Principal Capital Inc.**
120 Adelaide Street West, Suite 2500
Toronto, Ontario M5H 1T1,Canada
Attention: Will Byrd

**Nordic Trust Alliance KB**
8297 Championmsgate Blvd. Suite 459
Championsgate, Florida 33896
Attention: Daniel Fernandez

**Nordic Trust Alliance KB**
121 S Orange Ave. Suite 1527
Orlando, Fl 32801
Attention: Daniel Fernandez

**Re: Demand for Immediate Release of Funds and Compensation**

Dear Sir/Madam,

I am writing to you on behalf of DW Klein & Co., Corporation, regarding a matter of utmost urgency and importance. As of the date of this letter, it has come to our attention that funds totaling one million dollars, plus accrued interest, which were entrusted to Velanos Capital and subsequently transferred to Nordic Trust Alliance Bank, have been unjustly and unlawfully withheld since June of 2023 in account number NTA977840060.

The aforementioned funds were initially deposited with the understanding that Velanos Capital guarantees the availability of at least twice the amount of funds on hand to ensure timely repayment within 30 days, as per our agreement and in accordance with Texas law. It was represented to us that Velanos Capital maintained this requirement through the structuring of standby letters of credit that could be readily liquidated, thus providing assurances of liquidity and security.

Despite these assurances, the funds have been inexplicably tied up at Nordic Trust Alliance Bank for an extended period, causing significant financial harm and distress to DW Klein & Co., Corporation. This delay in the release of funds has resulted in substantial losses and has hindered our ability to meet critical financial obligations and operational needs.

# DW|KLEIN & CO.
### FUNDING CAPITAL LENDING

We demand the immediate release of the aforementioned funds, including any accrued interest, held at Nordic Trust Alliance Bank. Furthermore, we expect full compensation for any damages incurred as a result of the unjustified withholding of funds, including but not limited to lost income, legal fees, and associated costs.

Please be advised that failure to comply with this demand within a reasonable timeframe will leave us with no choice but to pursue all available legal remedies to recover the funds and seek appropriate compensation for damages incurred. We urge Velanos Capital and Nordic Trust Alliance Bank to act swiftly and in good faith to rectify this matter and avoid further escalation.

Given the international nature of this transaction, we remind both parties of their obligations under relevant international laws and agreements governing financial transactions, including but not limited to those between the United States, Canada, and Sweden.

We trust that you will treat this matter with the seriousness and urgency it warrants and look forward to a prompt resolution.

Sincerely,

Donald Klein
Managing Principal
DW Klein & Co.,Corporation

# EXHIBIT B

April 25, 2023, Wire Transfer Record (Bank of America outbound record)



**BANK OF AMERICA**
PO Box 25118
Tampa, FL 33622-5118

Information You Requested

**Account ending in**
6903
**Case number**
250717NS006975
**Date**
July 18, 2025

DW KLEIN & CO. CORPORATION
10380 FOUTCH RD
PILOT POINT TX 76258-6003

## Here's the information on the transactions you asked about.

This is the electronic transaction(s) that posted to your account:

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| April 25, 2023 | WIRE TYPE:INTL OUT DATE:230425 TIME:1102 ET TRN:2023042500319845 SERVICE REF:253351  BNF:VELANOS PRINCIPAL CAPITAL, ID:221520007617 BNF BK:THE BANK OF NOVA SCOTIA ID:006550726001 PMT DET:********* SBLC | $1,000,000.00 |

### Helpful reminders

Unfortunately, we can't provide copies of the transaction(s) because there isn't an actual image. If you'd like account statements, here's what you can do:

- Access online statements for active accounts in Online Banking at bankofamerica.com — you can view transactions from the past seven years.

- Order statement copies for open, closed or inactive accounts by calling us at 800.432.1000 — you can request statements from the past seven years.

- You can check your balance any time 24/7 using Online Banking or you can ask Erica, our new virtual financial assistant, to tell you your balance by signing into our Mobile Banking app and tapping the Erica icon. Enroll at bankofamerica.com.

Thank you for banking with us.

Bank of America and the Bank of America logo are registered trademarks of the Bank of America Corporation.
Bank of America, N.A. Member FDIC.

## EXHIBIT B-1

**Wire Confirmation – US$1,000,000 Transfer (Aug 1, 2023)**

*Description:* Bank of America outgoing wire receipt and SWIFT message confirming transfer to Velanos Principal Capital, The Bank of Nova Scotia, then transferred to NORDIC TRUST - Statute: 18 U.S.C. § 1343 (Wire Fraud) Nordic Trust Alliance KB, CIBC Acct. NTA-977840060.

## EXHIBIT B-2

**Proof US$1,000,000 Transfer (Aug 1, 2023)**

*Description:* Nordic trust account showing $1,000,000.00 in situ with $25.00 fee deductions NORDIC TRUST -Statute: 18 U.S.C. § 1343 (Wire Fraud) Nordic Trust Alliance KB, CIBC Acct. NTA-977840060.



NORDIC
TRUST ALLIANCE
BANKING

| Account number | Current Balance | Available Balance | Account Type | Status | Currency |
|---|---|---|---|---|---|
| NTA977840060 | 999,500.00 | 999,500.00 | Trust USD | Active | USD |

| Date | ID | Description | Debit/Credit | Current Balance | Status |
|---|---|---|---|---|---|
| 07/01/2025 02:00 | 4696 | Monthly Maintenance Fee | -25.00 | 999,500.00 | Executed |
| 06/01/2025 02:00 | 4368 | Monthly Maintenance Fee | -25.00 | 999,525.00 | Executed |
| 05/01/2025 02:00 | 4066 | Monthly Maintenance Fee | -25.00 | 999,550.00 | Executed |
| 04/01/2025 02:00 | 3750 | Monthly Maintenance Fee | -25.00 | 999,575.00 | Executed |
| 03/01/2025 01:00 | 3327 | Monthly Maintenance Fee | -25.00 | 999,600.00 | Executed |
| 02/01/2025 01:00 | 2833 | Monthly Maintenance Fee | -25.00 | 999,625.00 | Executed |
| 01/01/2025 01:00 | 2332 | Monthly Maintenance Fee | -25.00 | 999,650.00 | Executed |
| 12/01/2024 01:00 | 1924 | Monthly Maintenance Fee | -25.00 | 999,675.00 | Executed |
| 11/01/2024 01:00 | 1675 | Monthly Maintenance Fee | -25.00 | 999,700.00 | Executed |
| 10/01/2024 02:00 | 1495 | Monthly Maintenance Fee | -25.00 | 999,725.00 | Executed |
| 09/01/2024 02:00 | 1325 | Monthly Maintenance Fee | -25.00 | 999,750.00 | Executed |
| 08/01/2024 02:00 | 1307 | Monthly Maintenance Fee | -25.00 | 999,775.00 | Executed |
| 02/01/2024 01:00 | 458 | Monthly Maintenance Fee | -25.00 | 999,800.00 | Executed |
| 01/23/2024 21:19 | 121 | OWT/ USD 950000 DW Klein & Co. Corporation DWK | -950,000.00 | 999,950.00 | Canceled |
| 01/01/2024 01:00 | 382 | Monthly Maintenance Fee | -25.00 | 999,825.00 | Executed |
| 12/01/2023 01:00 | 314 | Monthly Maintenance Fee | -25.00 | 999,850.00 | Executed |
| 11/01/2023 01:00 | 252 | Monthly Maintenance Fee | -25.00 | 999,875.00 | Executed |
| 10/01/2023 02:00 | 190 | Monthly Maintenance Fee | -25.00 | 999,900.00 | Executed |
| 09/01/2023 02:00 | 136 | Monthly Maintenance Fee | -25.00 | 999,925.00 | Executed |
| 08/01/2023 02:00 | 83 | Monthly Maintenance Fee | -25.00 | 999,950.00 | Executed |
| 07/01/2023 02:00 | 32 | Monthly Maintenance Fee | -25.00 | 999,975.00 | Executed |
| 06/20/2023 23:46 | 12 | Velanos - FST Credit | 1,000,000.00 | 1,000,000.00 | Executed |

https://cl070623.ebanqsandbox.com/my-accounts?accountId=7&sort=-
statusChangedAt&query=&dateFrom=&dateTo=&size=25&page=1

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| **DONALD W. KLEIN, Individually,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. _____** |
| **VELANOS PRINCIPAL CAPITAL INC.;** | § | |
| **NORDIC TRUST ALLIANCE KB;** | § | |
| **JAMES WILLIAM BYRD;** | § | |
| **DANIEL FERNANDEZ ROJO FILHO;** | § | |
| **ESTATE OF JAMES WILLIAM BYRD;** | § | |
| **JOSHUA WEARMOUTH** | § | |
| **LYNDA K BYRD, Successor-in-Interest,** | § | |
| **LYNDA K. BYRD, Individually,** | § | |
| **Defendants.** | § | |

## EXHIBIT C

### Ledger of Unauthorized $25 Monthly Debits (Oct 2023 – Jan 2025)

*Description:* Bank screenshots and statement excerpts evidencing fifteen (15) post-wire withdrawals labelled "NTA Service Fee."

1

NTA9778400060

**Current Balance**
USD 999,525.00
USD 999,525.00 available

Account Type: Trust USD
Status: Active

| Date | ID | Description | Debit/Credit | Current Balance |
|---|---|---|---|---|
| Date from | ID | Description | | |
| Date to | | | | |
| 06/01/2025 02:00 | 4368 | Monthly Maintenance Fee | -25.00 | 999,525.00 |
| 05/01/2025 02:00 | 4066 | Monthly Maintenance Fee | -25.00 | 999,550.00 |
| 04/01/2025 02:00 | 3750 | Monthly Maintenance Fee | -25.00 | 999,575.00 |
| 03/01/2025 01:00 | 3327 | Monthly Maintenance Fee | -25.00 | 999,600.00 |
| 02/01/2025 01:00 | 2833 | Monthly Maintenance Fee | -25.00 | 999,625.00 |
| 01/01/2025 01:00 | 2332 | Monthly Maintenance Fee | -25.00 | 999,650.00 |
| 12/01/2024 01:00 | 1924 | Monthly Maintenance Fee | -25.00 | 999,675.00 |
| 11/01/2024 01:00 | 1675 | Monthly Maintenance Fee | -25.00 | 999,700.00 |
| 10/01/2024 02:00 | 1495 | Monthly Maintenance Fee | -25.00 | 999,725.00 |
| 09/01/2024 02:00 | 1325 | Monthly Maintenance Fee | -25.00 | 999,750.00 |
| 08/01/2024 02:00 | 1307 | Monthly Maintenance Fee | -25.00 | 999,775.00 |
| 07/01/2024 01:00 | 458 | Monthly Maintenance Fee | -25.00 | 999,800.00 |
| 01/24/2024 21:19 | 121 | OWT / USD 950000 DW Klein & Co. Corporation DWK | -950,000.00 | 999,950.00 |
| 01/01/2024 01:00 | 382 | Monthly Maintenance Fee | -25.00 | 999,825.00 |
| 12/01/2023 01:00 | 314 | Monthly Maintenance Fee | -25.00 | 999,850.00 |

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| **DONALD W. KLEIN, Individually,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. _____** |
| **VELANOS PRINCIPAL CAPITAL INC.;** | § | |
| **NORDIC TRUST ALLIANCE KB;** | § | |
| **JAMES WILLIAM BYRD;** | § | |
| **DANIEL FERNANDEZ ROJO FILHO;** | § | |
| **ESTATE OF JAMES WILLIAM BYRD;** | § | |
| **JOSHUA WEARMOUTH** | § | |
| **LYNDA K BYRD, Successor-in-Interest,** | § | |
| **LYNDA K. BYRD, Individually,** | § | |
| **Defendants.** | § | |

### EXHIBIT D

**Joint Venture / SBLC Agreement (April 24, 2023)**

*Description:* Executed agreement outlining Defendants' promise to collateralize funds through a standby letter of credit within thirty (30) days.

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (HEREINAFTER REFERRED TO AS ("**AGREEMENT**" OR "**JVA**") IS EXECUTED WITHOUT PREJUDICE OR CONFLICT OF INTEREST, DULY UNDERSTOOD AND SIGNED BY BOTH PARTIES ACTING AT THEIR OWN ACCORD ON THIS DAY, _____4/24/2023_____ BY AND BETWEEN:

## ("PARTY A")

| COMPANY NAME | DW KLEIN & CO, Corp |
|---|---|
| REGISTERED ADDRESS | 10380 FOUTCH RD, PILOT POINT, TX 76258 |
| REGISTRATION NUMBER | 84-236098 |
| REPRESENTED BY | DONALD KLEIN |
| POSITION | MANAGING PRINCIPAL |
| PASSPORT NUMBER | 56691830 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 469-237-7744 |
| EMAIL | DK@DWKLEIN.COM |

**AND**

## ("PARTY B")

| COMPANY NAME | VELANOS PRINCIPAL CAPITAL INC. |
|---|---|
| REGISTERED ADDRESS | 120 Adelaide Street West, Suite 2500, Toronto ON, M5H 1T1, Canada |
| REGISTRATION NUMBER | 1095476-4 |
| REPRESENTED BY | JOSHUA M. WEARMOUTH |
| POSITION | MANAGING PARTNER |
| PASSPORT NUMBER | 515363842 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 949-220-3555 |
| EMAIL | JWEARMOUTH@VELANOSPC.COM |

EACH OF THE PARTIES, AS THE CONTEXT MAY REQUIRE, MAY SOMETIMES HEREAFTER BE REFERRED TO AS COLLECTIVELY AS THE "**PARTIES**".



## RECITALS:

I.  WHEREAS THE PARTIES WISH TO FORM A JOINT VENTURE IN ORDER TO PARTICIPATE IN ONE OR MORE PRIVATE BUSINESS OPPORTUNITIES, INCLUDING BUT NOT LIMITED TO THE TRADING OF CURRENCY, NOTES, BONDS, FINANCIAL INSTRUMENTS, PHYSICAL COMMODITIES, PRECIOUS METALS, AND PROJECT FINANCING INITIATIVES (EACH A "**TRANSACTION(S)**" OR "**TRADE(S)**", AND HAVING THE SAME MEANING HEREIN); AND

II.  WHEREAS PARTY B IS EXPERIENCED IN AND WILL PROVIDE THE STRUCTURING TO GENERATE LIQUIDITY AND RETURNS AND PROJECT FINANCING FROM ASSETS AND CASH THROUGH COLLATERALISATION, SECURITISATION, MANAGING TRADES AND TRANSACTIONS, AND STRUCTURING AND ADMINISTERING JOINT VENTURES; AND

III.  WHEREAS PARTY A IS PREPARED TO MAKE AVAILABLE A FINANCIAL INSTRUMENT(S) AND/OR ACCOUNT STATEMENT(S) FOR MONETIZATION, AND/OR CASH TO PUT ON TRADE OR TO FACILITATE TRANSACTIONS, (THE "**CASH/ASSET**") TO PROVIDE THE JOINT VENTURE PARTNER WITH INITIAL CAPITAL RESOURCES; AND

IV.  WHEREAS PARTY A HEREBY CONFIRMS, WITH FULL LEGAL RESPONSIBILITY, UNDER PENALTY OF PERJURY OF LAW THAT IT IS READY, WILLING AND ABLE TO DELIVER CASH FUNDS AND/OR ACCOUNT STATEMENT(S), UNDER THE TERMS AND CONDITIONS DESCRIBED BELOW, BASED ON GOOD, CLEAN, CLEAR UNENCUMBERED FUNDS OF NON-CRIMINAL ORIGIN; AND

V.  WHEREAS PARTY B IS PREPARED TO DIRECT AND MANAGE THE PLACEMENT OF THE CASH/ASSET(S) INTO ONE OR MORE TRADES, AND/OR FACILITATE AND/OR EXECUTE ONE OR MORE TRANSACTIONS TO ACCOMPLISH THE OBJECTIVES OF THE JOINT VENTURE (THE "**PURPOSE**"),

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE IN-PRINCIPLE TO THE FOLLOWING:

1.  **JOINT VENTURE:** THE PARTIES AGREE TO ENTER INTO THIS JOINT VENTURE (THE "**JV**") ON THE TERMS AND CONDITIONS SET FORTH HEREIN. THE JV SHALL NOT BE A NEW CORPORATE, LEGAL, OR SPECIAL PURPOSE VEHICLE / ENTITY, BUT INSTEAD BE CREATED BY THIS AGREEMENT AND MANIFESTED THROUGH THE MUTUAL COOPERATION OF THE EXISTING TWO ENTITIES ACCORDING TO THEIR SPECIFIC CONTRIBUTIONS AS DETAILED HEREIN ("**ACTIVITIES**"), AND THE SHARING OF DISTRIBUTIONS THAT RESULT FROM THE JV ACTIVITIES AND ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV ("**DISTRIBUTIONS**"). THE JV SHALL COMMENCE OPERATIONS AS OF THE EFFECTIVE DATE OF EACH TRANSACTION WHICH WILL BE BASED ON THE DATE OF THE CASH/ASSET CONTRIBUTION AND ADVISED BY PARTY B TO PARTY A ON A CASE-BY-CASE BASIS.

2.  **BUSINESS PURPOSE / CONTRIBUTIONS / DISTRIBUTION SHARING:** THE PARTIES ARE ENTERING INTO THIS JV TO COLLECTIVELY PURSUE PRIVATE BUSINESS OPPORTUNITIES FOR THEIR MUTUAL BENEFIT CONSISTENT WITH THE PURPOSE AND ACTIVITIES. THE PARTIES' CONTRIBUTIONS AND ROLES IN THE JV SHALL BE AS FOLLOWS:

    2.1. PARTY A SHALL CONTRIBUTE THE CASH/ASSET FOR TRANSACTION/TRADE ACCORDING TO THE TERMS AND CONDITIONS BELOW AND THE SCHEDULE ATTACHED HEREIN.

    2.2. PARTY A SHALL BE CONSIDERED TO HAVE DONE SO BY SIGNING THIS AGREEMENT AND WILL SERVE AS SIGNATORY PARTNER TO THE JV.

    2.3. REGARDING THE CONTRIBUTED ASSET, PARTY A REPRESENTS AND WARRANTS THAT:

        2.3.1. IT OWNS, CONTROLS, AND/OR HAS BEEN GRANTED NECESSARY AUTHORITY OVER THE CASH/ASSET THROUGH ANOTHER AGREEMENT THAT IS OUTSIDE OF THIS AGREEMENT AND TO WHICH THE PARTY B IS NOT A PARTY TO, AND IT WILL TAKE FULL AND SOLE RESPONSIBILITY AND LIABILITY FOR ITS PROPER AND TIMELY DELIVERY AS REQUIRED BY THE TERMS AND CONDITIONS BELOW AND PROCEDURES DESCRIBED HEREIN; AND



INITIALS



2.3.2. THE CASH/ASSET IS FREE AND CLEAR OF ANY AND ALL LIENS AND ENCUMBRANCES AND COMPOSED OF GOOD, CLEAR, CLEAN FUNDS OF NON-CRIMINAL ORIGIN; AND

2.3.3. IT HAS SUCCESSFULLY COMPLETED RIGOROUS DUE DILIGENCE ON THE CASH/ASSET AND ANY ASSOCIATED PARTIES AND CONFIRMS THEIR CREDIBILITY AND LEGITIMACY.

2.4. PARTY B SHALL CONTRIBUTE ITS EXPERIENCE, INTELLECTUAL PROPERTY, CONTACTS, RELATIONSHIPS AND STRUCTURAL RESOURCES, PROFESSIONAL SERVICE PROVIDERS AND SHALL HAVE THE AUTHORITY TO STRUCTURE AND EXECUTE ASSET LIQUIDITY AND PROJECT FINANCING STRATEGIES, PLACE CASH/ASSET(S) INTO OR TO FACILITATE ONE OR MORE TRANSACTION/TRADE(S) AND TO MANAGE, DIRECT, AND OVERSEE SUCH TRANSACTION/TRADE(S).

2.5 PARTY B SHALL NOT BE CONSTRUED AS AN INVESTMENT OR FUND MANAGER OR ADVISOR, OR IN ANY WAY BE CONSIDERED TO BE CONDUCTING ANY FINANCIAL OR OTHER ACTIVITY WHATSOEVER WHERE A REGULATORY LICENSE WOULD BE REQUIRED.

3. **COMPENSATION**: THE PARTIES SHALL BE COMPENSATED HEREUNDER ON A BEST EFFORTS BASIS. THE COMPENSATION SHALL BE DISTRIBUTED TO THE PARTIES ACCORDING TO THE SPECIFIC SCHEDULE FOR EACH TRANSACTION (DETAILED IN THE **"TRANSACTION DISTRIBUTION SCHEDULE"** IN APPENDIX I HEREIN), EACH WITH ITS OWN UNIQUE REFERENCE CODE. FOR PURPOSES HEREIN, DISTRIBUTIONS SHALL BE DEFINED AS THE GROSS DISTRIBUTIONS RESULTING FROM THE ACTIVITIES WHICH ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV PARTNERS AS DETAILED IN THE TRANSACTION DISTRIBUTION SCHEDULE I, LESS ANY BANKING, LEGAL, ADMINISTRATIVE, OR PROFESSIONAL SERVICES COSTS INCURRED BY THE JV IN THE COURSE OF CONDUCTING THE ACTIVITIES.

4. **JOINT VENTURE GOVERNANCE:** PARTY B SHALL MANAGE THE BUSINESS AFFAIRS OF THE JV FOR THE BENEFIT OF THE PARTIES IN ITS REASONABLE BUSINESS JUDGMENT AND SHALL CONFER WITH THE PARTY A ON A REGULAR BASIS WITH REGARD TO JV MATTERS.

5. **COSTS AND EXPENSES**: EACH PARTY SHALL BE RESPONSIBLE FOR ITS OWN COSTS IN CONNECTION WITH THE PREPARATION, NEGOTIATION OF THE FORMATION OF THE JOINT VENTURE AND THE EXECUTION OF THIS AGREEMENT.

6. **BREACH, LAW, JURISDICTION AND REMEDIES:** IN THE EVENT OF A BREACH HEREUNDER, THE NON- BREACHING PARTY SHALL PROVIDE THE BREACHING PARTY WITH WRITTEN NOTICE OF BREACH AND THE BREACHING PARTY SHALL HAVE A COMMERCIALLY REASONABLE AMOUNT OF TIME, NOT TO EXCEED SIXTY (60) DAYS, TO CURE THE BREACH. IF THE BREACH IS NOT CURED AS AFORESAID, IT SHALL BE DEEMED A "MATERIAL BREACH" AND THE BREACHING PARTY SHALL INDEMNIFY AND SAVE THE NON-BREACHING PARTY HARMLESS FROM ALL DAMAGE, COST AND EXPENSE OCCASIONED BY SAID MATERIAL BREACH, INCLUDING THE COST OF SUIT AND REASONABLE ATTORNEY'S FEES. IN ADDITION, A MATERIAL BREACH HEREUNDER SHALL GIVE THE NON-BREACHING PARTY(S), BY WRITTEN NOTICE TO THE BREACHING PARTY, THE RIGHT TO TERMINATE THIS AGREEMENT EFFECTIVE AS OF THE DATE THE BREACH(ES) BECOME MATERIAL BREACH(ES). THIS AGREEMENT SHALL BE GOVERNED BY THE LAW OF ENGLAND AND WALES APPLICABLE TO CONTRACTS WHOLLY TO BE PERFORMED THEREIN WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS THEREOF. THE PARTIES AGREE AND ADMIT TO THE PERSONAL JURISDICTION OF, AS APPLICABLE, THE RELEVANT ARBITRATION COURT, OR COURT OF LAW/EQUITY IN ENGLAND. EXCEPT FOR MATTERS REQUIRING EQUITABLE RELIEF, WHICH SHALL BE LITIGATED IN THE APPLICABLE ENGLISH COURT, ALL OTHER MATTERS OF DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE REFERRED TO AND FINALLY RESOLVED BY ARBITRATION IN LONDON BEFORE THREE ARBITRATORS UNDER THE LONDON COURT OF INTERNATIONAL ARBITRATION'S ARBITRATION RULES FROM TIME TO TIME IN FORCE ("THE RULES"). THIS CLAUSE INCORPORATES THE RULES EXCEPT WHERE THEY CONFLICT WITH ITS EXPRESS TERMS. ANY REQUIREMENT IN THE RULES TO TAKE ACCOUNT OF THE NATIONALITY OF ANY PROPOSED ARBITRATOR IS DISAPPLIED AND A PERSON SHALL BE NOMINATED OR APPOINTED AS AN ARBITRATOR WITHOUT REGARD TO HIS OR HER NATIONALITY. EACH PARTY SHALL APPOINT ONE ARBITRATOR AND THE THIRD ARBITRATOR (WHO SHALL BE THE



INITIALS

DocuSign Envelope ID: 95E171AF-B85A-4083-B24A-D2090F787A41



CHAIRMAN OF THE TRIBUNAL) SHALL BE APPOINTED BY THE TWO PARTY-APPOINTED ARBITRATORS. IF ANY OF THE PARTIES FAIL TO NOMINATE AN ARBITRATOR OR THE TWO PARTY-APPOINTED ARBITRATORS FAIL TO NOMINATE A THIRD ARBITRATOR, THE APPOINTMENTS SHALL BE MADE BY THE LCIA COURT. THE PARTIES AGREE THAT THE LOSING PARTY IN ANY SUCH EQUITABLE CLAIM OR ARBITRATION HEREUNDER SHALL HOLD THE PREVAILING PARTY HARMLESS FROM ALL COST, DAMAGE AND EXPENSE INCURRED AS A RESULT OF THE APPLICABLE CLAIM OR ACTION.

7. **LEGAL ADVICE:** EACH PARTY HAS HAD THE OPPORTUNITY TO RECEIVE BUSINESS, FINANCIAL AND LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT, AND/OR HAS THE REQUISITE EXPERIENCE AND SOPHISTICATION TO UNDERSTAND, INTERPRET AND AGREE TO THE TERMS AND PROVISIONS HEREOF AND HAVE VOLUNTARILY WAIVED THEIR RIGHT TO RECEIVE INDEPENDENT COUNSEL AND ADVICE WITH RESPECT THERETO.

8. **ENTIRE AGREEMENT / ASSIGNMENT / RECITALS:** THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDING ALL NEGOTIATIONS, PRIOR DISCUSSIONS, PRELIMINARY AGREEMENTS AND ALL PRIOR AGREEMENTS BETWEEN THE PARTIES AND THEIR AFFILIATES MADE PRIOR TO THE DATE HEREOF, AND SHALL NOT BE CHANGED EXCEPT BY AN INSTRUMENT SIGNED BY THE PARTIES HERETO. THIS AGREEMENT MAY NOT BE ASSIGNED WITHOUT THE EXPRESS, WRITTEN PERMISSION OF THE NON-ASSIGNING PARTIES. THE RECITALS TO THIS AGREEMENT SHALL BE DEEMED TO BE PART OF THE AGREEMENT.

9. **NOTICES:** ALL NOTICES HEREUNDER SHALL BE IN WRITING, ADDRESSED TO THE PARTY AT THE ADDRESS SET FORTH HEREIN, AND SHALL BE SENT, WITH PROOF OF DELIVERY, BY ELECTRONIC, CERTIFIED OR REGISTERED MAIL, OR BY COURIER. IN THE EVENT THAT THE ADDRESS OR CONTACT INFORMATION FOR ANY PARTY CHANGES, SUCH PARTY SHALL PROMPTLY PROVIDE NOTICE TO THE OTHER PARTY OF SUCH CHANGE(S).

10. **CONFIDENTIAL INFORMATION**: BY VIRTUE OF THIS AGREEMENT, EACH PARTY MAY OBTAIN CERTAIN CONFIDENTIAL OR PROPRIETARY INFORMATION. FOR PURPOSES OF THIS AGREEMENT, THE TERM **"CONFIDENTIAL INFORMATION"** MEANS ALL INFORMATION WHICH IS DELIVERED BY ANY PARTY, THEIR AFFILIATES OR THEIR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT, WHICH IS NON- PUBLIC AND IDENTIFIED AS BEING CONFIDENTIAL OR PROPRIETARY. THE PARTIES AGREE THAT THEY AND THEIR RESPECTIVE REPRESENTATIVES WILL NOT USE ANY CONFIDENTIAL INFORMATION FOR ANY PURPOSE OTHER THAN TO FULFILL THEIR UNDERTAKINGS PURSUANT TO THIS AGREEMENT FOR A PERIOD OF FIVE YEARS FROM TERMINATION OF THIS AGREEMENT. THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES WILL KEEP THE CONFIDENTIAL INFORMATION COMPLETELY CONFIDENTIAL; PROVIDED, HOWEVER, THAT THE CONFIDENTIAL INFORMATION MAY BE DISCLOSED TO THEIR REPRESENTATIVES OR AFFILIATES WHO NEED TO REVIEW THE CONFIDENTIAL INFORMATION (IT BEING UNDERSTOOD THAT THEIR REPRESENTATIVES SHALL BE INFORMED OF THE CONFIDENTIAL NATURE OF SUCH CONFIDENTIAL INFORMATION AND SHALL BE DIRECTED TO TREAT THE CONFIDENTIAL INFORMATION IN ACCORDANCE WITH THIS AGREEMENT). THE PARTIES SHALL TREAT AS CONFIDENTIAL ALL NAMES, TELEPHONE NUMBERS, EMAIL ADDRESSES, TELEX NUMBERS, FACSIMILE NUMBERS AND ANY OTHER FORM OF CONTACT COORDINATES AS WELL AS ANY OTHER INFORMATION EXCHANGED BETWEEN THE PARTIES, EACH PLEDGING NOT TO DISCLOSE TO ANY OTHER ENTITY OR INDIVIDUALS, EXCEPT WHEN REQUIRED FOR THE PURPOSE OF THE JV TRANSACTION(S), ANY SUCH INFORMATION, WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE NON-DISCLOSING PARTY. SHOULD THE NON-DISCLOSING PARTY OR ANY RELATED INDIVIDUALS, CORPORATIONS, DIVISIONS, ASSOCIATES, THIRD PARTIES OR OTHER FORM OF ENTITY RELATED IN ANY WAY TO THE NON-DISCLOSING PARTY ATTEMPT TO PARTICIPATE IN A SUBSEQUENT TRANSACTION INVOLVING THE OF THE SAME INDIVIDUALS OR ENTITIES DISCLOSED BY THE DISCLOSING PARTY DURING THE TERM OF THIS AGREEMENT AND DURING THE THREE (3) YEARS THEREAFTER IN RESPECT OF INTRODUCTIONS, INFORMATION, RECOMMENDATIONS, DATA OR OTHER KNOWLEDGE ACQUIRED FROM THE DISCLOSING PARTY, THE DISCLOSING PARTY SHALL BE ENTITLED TO COMPENSATION IN AN AMOUNT EQUAL TO ALL PROCEEDS PAID TO THE NON-DISCLOSING PARTY OR ITS RELATED PARTIES OR AFFILIATES.

11. **REQUIRED DISCLOSURE:** IN THE EVENT THAT A PARTY OR ANY OF THEIR REPRESENTATIVES RECEIVES A REQUEST, OR IS REQUIRED (BY DEPOSITION, INTERROGATORY, REQUEST FOR DOCUMENTS, SUBPOENA, CIVIL INVESTIGATIVE DEMAND OR SIMILAR PROCESS) TO DISCLOSE CONFIDENTIAL INFORMATION, THE PARTIES



INITIALS

DocuSign Envelope ID: 95E77AF-B85A-4083-B24A-D209DF787A41

AGREE TO (I) IMMEDIATELY NOTIFY THE OTHER PARTY OF THE EXISTENCE, TERMS AND CIRCUMSTANCES SURROUNDING SUCH A REQUEST; (II) CONSULT WITH THE OTHER PARTY ON THE ADVISABILITY OF TAKING LEGALLY AVAILABLE STEPS TO RESIST OR NARROW SUCH REQUEST; AND (III) ASSIST THE OTHER PARTY IN SEEKING A PROTECTIVE ORDER OR OTHER APPROPRIATE REMEDY. IN THE EVENT THAT SUCH PROTECTIVE ORDER OR OTHER REMEDY IS NOT OBTAINED, OR THE OTHER PARTY WAIVES COMPLIANCE WITH THE PROVISIONS HEREOF, (I) A PARTY OR THEIR REPRESENTATIVES MAY DISCLOSE TO ANY TRIBUNAL ONLY THAT PORTION OF SUCH CONFIDENTIAL INFORMATION WHICH THEY ARE ADVISED BY COUNSEL IS LEGALLY REQUIRED TO BE DISCLOSED, AND SHALL EXERCISE THEIR BEST EFFORTS TO OBTAIN ASSURANCE THAT CONFIDENTIAL TREATMENT WILL BE ACCORDED SUCH CONFIDENTIAL INFORMATION; AND (II) THEY SHALL NOT BE LIABLE FOR SUCH DISCLOSURE UNLESS DISCLOSURE TO ANY SUCH TRIBUNAL WAS CAUSED BY OR RESULTED FROM A PREVIOUS DISCLOSURE BY A PARTY OR THEIR REPRESENTATIVES NOT PERMITTED BY THIS AGREEMENT.

13. **NON-CIRCUMVENTION:** WITH RESPECT TO ANY INTRODUCTIONS MADE BY THE PARTIES TO EACH OTHER HEREUNDER, THE PARTIES AGREE THAT THEY SHALL EACH NOT: (I) CIRCUMVENT, OR ATTEMPT TO CIRCUMVENT, THE OTHER PARTY FOR THE PURPOSE OF DEPRIVING THE OTHER PARTY OF ANY COMPENSATION TO WHICH THE OTHER PARTY IS OR WOULD BE ENTITLED TO HEREUNDER; AND (II) SOLICIT ANY PARTY INTRODUCED BY THE OTHER PARTY FOR THE PURPOSE OF ANY TRANSACTION, DEAL OR OPPORTUNITY FOR A PERIOD OF FIVE (5) YEARS FROM THE DATE OF ANY SUCH INTRODUCTION, WITHOUT THE EXPRESS WRITTEN CONSENT OF THE INTRODUCING PARTY. THE PARTIES FURTHER AGREE THAT IN THE EVENT THAT A PARTY CIRCUMVENTS OR ATTEMPTS TO CIRCUMVENT THE OTHER PARTY, THE NON-CIRCUMVENTING PARTY SHALL BE ENTITLED TO LIQUIDATED DAMAGES EQUAL TO THE TOTAL COMPENSATION RECEIVED BY THE CIRCUMVENTING PARTY FROM THE TRANSACTION IN WHICH THE ATTEMPTED CIRCUMVENTION OR ACTUAL CIRCUMVENTION OCCURS.

14. **REPRESENTATIONS AND WARRANTIES:** THE PARTIES REPRESENT AND WARRANT AS FOLLOWS:

   14.1.   THE PARTIES ARE NOT REGISTERED AND ARE NOT REQUIRED TO BE REGISTERED AS INVESTMENT ADVISERS.

   14.2.   THE INDIVIDUAL PERSONS EXECUTING THIS AGREEMENT ON BEHALF OF EACH RESPECTIVE PARTY ARE DULY AUTHORIZED TO ENTER INTO THIS AGREEMENT BY AND ON BEHALF OF EACH RESPECTIVE PARTY.

   14.3.   THE PARTIES ARE DULY FORMED, VALIDLY EXISTING AND IN GOOD STANDING UNDER THE REGISTRAR OF COMPANIES IN THEIR JURISDICTION OF FORMATION AND ARE QUALIFIED TO DO BUSINESS IN ALL OTHER JURISDICTIONS WHERE THEIR BUSINESS REQUIRES THEM TO BE QUALIFIED.

15. **BINDING EFFECT:** THIS AGREEMENT SHALL BE BINDING UPON THE PARTIES HERETO AND UPON THEIR RESPECTIVE HEIRS, SUCCESSORS, LEGATEES, EXECUTORS, ADMINISTRATORS AND PERMITTED ASSIGNS, AND WILL INURE TO THEIR BENEFIT.

16. **WARRANTIES / DISCLAIMER:** THE PARTIES MUTUALLY WARRANT AND REPRESENT TO EACH OTHER THAT THEY EACH HAVE THE FULL RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS AGREEMENT AND TO FULLY PERFORM THEIR OBLIGATIONS HEREUNDER.

17. **BENEFICIARIES:** THE BENEFIT OF THIS AGREEMENT AFTER EXECUTED BY THE PARTIES HEREIN SHALL BE INCLUSIVE TO THE HEIRS OF THE ESTATES OF THE NAMED PARTIES/BENEFICIARIES ANDTHE PARTIES' ASSIGNS.

18. **TAXES:** NO REPRESENTATIONS ARE HEREBY MADE OR IMPLIED WITH REGARD TO THE TAX IMPLICATIONS, IF ANY, IN RESPECT OF ANY TRANSACTIONS HEREUNDER. THE PARTIES INDIVIDUALLY AND SEPARATELY ACCEPT THEIR OWN RESPONSIBILITIES AND LIABILITIES FOR ANY TAXES, IMPOSTS, LEVIES, DUTIES OR CHARGES THAT MAY ARISE FROM THEIR RESPECTIVE INTERESTS IN THE JOINT VENTURE AND ITS ACTIVITIES.

19. **FORCE MAJEURE:** THIS AGREEMENT SHALL BE SUBJECT TO THE GENERAL RULES OF "FORCE MAJEURE" AS ESTABLISHED BY THE INTERNATIONAL CHAMBER OF COMMERCE, PARIS, FRANCE. FURTHER, SHOULD ANY ACT



INITIALS



OF GOD, WAR, BANK, THIRD-PARTY, OR GOVERNMENT COMPUTER FAILURE, DELAYS, INSURRECTION OR CIVIL DISTURBANCE OCCUR IN ANY COUNTRY WHERE THE JOINT VENTURE IS ACTIVE, IN WHOLE OR IN PART, THEREBY DELAYING OR MAKING PERFORMANCE BY ANY OF THE PARTIES AND/OR COUNTER PARTIES IMPOSSIBLE, THEN THIS AGREEMENT SHALL BE EXTENDED FOR SUCH TERM, AS IS REASONABLY DETERMINED BY THE NATURE OF THE OCCURRENCE.

20. **COUNTERPARTS / SIGNATURES:** THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS, EACH OF WHICH SHALL BE DEEMED TO BE AN ORIGINAL, AND ALL OF WHICH TAKEN TOGETHER SHALL CONSTITUTE ONE AND THE SAME DOCUMENT. A DIGITAL OR FACSIMILE SIGNATURE ON THIS AGREEMENT SHALL BE THE EQUIVALENT OF AN ORIGINAL SIGNATURE AND SUCH AGREEMENT SHALL BE DEEMED AN ORIGINAL AND SHALL BE FULLY ADMISSIBLE AND ENFORCEABLE IN ALL PROCEEDINGS.

21. **EXCLUSIVITY / ADDITIONAL TRANSACTIONS:** THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS JV IS EXCLUSIVE. IN THE EVENT THAT THE PARTIES MUTUALLY AGREE FOR ADDITIONAL ASSETS TO BE INVESTED INTO THE JV (THE"NEWINVESTMENT"), THEN THEY SHALL AMEND THIS AGREEMENT BY A WRITTEN AMENDMENT, SIGNED BY THE AUTHORIZED SIGNATORIES OF PARTY A AND THE TERMS AND CONDITIONS HEREOF SHALL APPLY TO ANY SUCH NEW TRANSACTION.

22. **EVENTS OF DEFAULT:** (I) ANY ATTEMPT TO CONTACT PARTY B'S BANK OFFICER(S), PROVIDER(S), PAYMASTER(S), RECEIVER(S), ESCROW OFFICER(S), OR ANY BANK STAFF RELATED TO THIS TRANSACTION; (II) ANY ACTION, SUIT, PROCEEDING OR INVESTIGATION OF ANY KIND INVOLVING, OR THREATENED AGAINST PARTY B, OR ANY SUBSIDIARY THEREOF, BEFORE ANY COURT OR ARBITRATOR OR ANY OTHER AUTHORITY WHICH (A) WOULD REASONABLY BE EXPECTED TO HAVE A MTERIAL ADVERSE EFFECT, OR (B) CALLS INTO QUESTION THE VALIDITY OR ENFORCEABILITY OF, OR OTHERWISE SEEKS TO INVALIDATE, ANY OF THE JV DOCUMENTS. ANY OF THE SPECIFIED EVENTS SHALL CONSTITUTE AN EVENT OF DEFAULT (EACH AN "EVENT OF DEFAULT").

23. **DISCLAIMER OF LIABILITY:** PARTY B HAS NO LIABILITY OR OBLIGATION IN CONNECTION WITH PARTY A EXCEPT TO MAKE DISTRIBUTIONS UNDER THE JVA AS AGREED AND MAKES NO WARRANTIES OR REPRESENTATIONS IN CONNECTION THEREWITH.

**WHEREUPON** THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR RESPECTIVE DULY AUTHORIZED SIGNATORIES AS OF THE EFFECTIVE DATE HEREOF.

**SIGNED ON THIS DAY,** 4/24/2023

**FOR AND BEHALF OF PARTY A:**

DocuSigned by:

*Donald Klein*

1C674A928159461

**NAME: MR. DONALD KLEIN**
**TITLE: MANAGING PRINCIPAL**

**FOR AND BEHALF OF PARTY B:**

DocuSigned by:

D85D494D21D149B

**NAME: MR. JOSHUA MATTHEW WEARMOUTH**
**TITLE: MANAGING PARTNER**





## APPENDIX I:

### TRANSACTION DISTRIBUTION SCHEDULE

| TRANSACTION CODE | JVA/VPC-DWKCO-I-03142023 |
|---|---|
| TRANSACTION TYPE | Strategic Capital/Systematic Purchase and Sell Transaction |
| TRANSACTING ASSET(S) | SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer |
| PARTY A CONTRIBUTION | LIQUID CASH FUNDS |
| PARTY A INSTRUMENT | Rolling Strategic Participation |
| PARTY A CONTRIBUTION SIZE | $4,000,000.00 USD (Four Million US Dollars) |
| PARTY A CONTRIBUTION DATE | $1,000,000.00 USD (One Million Dollars) within Twenty-Four Hours of JV Execution; $3,000,000.00 USD (Three Million Dollars) within Seven Days of JV Execution. |
| TRANSACTION COMMENCEMENT DATE | Ten (10) Banking Days, post commencement |
| TERM | Ninety (90) Banking Days |
| RETURN CALCULATION PEROID | Monthly |
| DISTRIBUTION FREQUENCY | $4m within Thirty (30) Banking Days; $21m within Ninety (90) Banking Days |
| PARTY A CONTINUATION TERMS | Subject to opportunity and mutual agreement |
| TRANSACTIONAL BANK(S) | TO BE DETERMINED |
| SPECIAL NOTES | 1. PARTY A WILL RETURN THE DULY EXECUTED JOINT VENTURE AGREEMENT WITH DUE DILIGENCE DOCUMENTS AS REQUIRED BY PARTY B. 2. PARTY A WILL REMIT THE CONTRIBUTION TO PARTY B'S RECEIVING BANK COORDINATES WITHIN THE PROSCRIBED TIME FRAME. 3. THE PARTIES MUTUALLY AGREE TO DEPLOY THE CONTRIBUTED CASH/ASSET STRATEGICALLY AND WITH(OUT) DISCRETION, INCLUDING FACILITATING A STRUCTURED PRODUCT BANK TRANSACTION. 4. PARTY B WILL PROVIDE PARTY A WITH AN ONGOING PARTICIPATION IN THE JV ACTIVITIES UP TO $25,000,000.00. 5. PARTY A MAY CHOOSE TO RECEIVE DISTRIBUTIONS TO ANY OF ITS NOMINATED BANK COORDINATES. 6. PARTY A MAY DECIDE TO WITHDRAW ITS CONTRIBUTED ASSET PLUS ANY ACCRUED DISTRIBUTIONS ENTITLEMENT AND EXIT THE JV AT ANY TIME AFTER THE FIRST DISTRIBUTION WITHIN TEN (10) BANKING DAYS. 7. SUBJECT TO OPPORTUNITY AND MUTUAL AGREEMENT, AT THE END OF THE TRANSACTION CYCLE, PARTY A MAY CONTINUE ITS ONGOING PARTICIPATION IN THE STRUCTURED PRODUCT BANK TRANSACTION. 8. PARTY B MAY CHOSE TO TERMINATE THIS AGREEMENT AT ANY TIME. |

**ACKNOWLEDGED, ACCEPTED, AND SIGNED ON THIS DAY:**

4/24/2023
_____, FOR AND BEHALF OF PARTY A:

DocuSigned by:
*Donald Klein*
1C674A928159461
**NAME: MR. DONALD KLEIN**
**TITLE: MANAGING PRINCIPAL**



## APPENDIX II:

**PARTY A BANKING COORDINATES FOR SENDING CONTRIBUTED CASH/ASSET**

| BANK NAME | Bank of America |
| --- | --- |
| BANK ADDRESS | 11050 US Highway 380, Cross Roads, Texas 76227-8334 |
| SORT CODE | N/A |
| SWIFT CODE | BOFAUS3N |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 488083966903 |
| IBAN | N/A |
| ACCOUNT NAME | DWKlein & Co. Corporation |
| BANK OFFICER | Brenda Lopez |
| BANK TELEPHONE | 940.283.5612 |
| BANK OFFICER EMAIL | |
| SPECIAL INSTRUCTIONS | |

**PARTY B BANKING COORDINATES FOR RECEIVING CONTRIBUTED CASH/ASSET**

| BANK NAME | Scotiabank / Bank of Nova Scotia |
| --- | --- |
| BANK ADDRESS | 3401 DUFFERIN ST; MAILBOX 54, TORONTO, ON, CANADA M6A 2T9 |
| SWIFT CODE | NOSCCATT |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 221520007617 |
| IBAN | N/A |
| ACCOUNT NAME | VELANOS PRINCIPAL CAPITAL, INC. |
| BANK OFFICER | JASOTHA ULAGANATHAN |
| BANK TELEPHONE | +1 416-784-5126 x4300 |
| BANK OFFICER EMAIL | JASOTHA.ULGANATHAN@SCOTIABANK.COM |
| SPECIAL INSTRUCTIONS | |



INITIALS

STRICTLY PRIVATE AND CONFIDENTIAL

**8 |** P a g e

DocuSign Envelope ID: 834175BC-A46C-431E-A089-18EF13770474

Terms and Contingent Commitment Letter

# VELANOS PRINCIPAL CAPITAL

RE: DW Klein & Co., LLC                                                                                           8/11/2023
10380 Foutch Rd. Pilot Point, TX 76258

To Whom It May Concern,

DW Klein & Co., LLC ("Client") is PRE-APPROVED for funding via non-recourse, asset-backed Line of Credit ("LOC") with Velanos Principal Capital, Inc ("Provider") to be used at the Company's discretion within the scope of the agreement. Funds are to be used for the construction and development of the Project.

### DEBT:

| | | |
|---|---|---|
| Project LOC Amount: | $2,000,000 | |
| Interest Credit Account (ICA): | $0 | *(Pre-paid Interest)* |
| Term: | 12 Months | |
| Rate: | 8.00% | *I/O* |
| Points: | 6.00% | |
| PPP (Pre-Payment Penalty): | None | |

### SPONSOR CONTRIBUTION:

| | | |
|---|---|---|
| Contribution amount: | $0 | |
| Risk Management Protection: | NONE | |
| Protection Fee: | $0 | **TOTAL FEE: $0** |
| Total Sponsor Contribution: | $0 | |

### EQUITY:

| | | |
|---|---|---|
| Equity Contribution Amount: | $0 | |
| Preferred Rate: | 0% | *(Open for Deferment)* |
| Equity Contribution Split: | N/A | |
| Additional Terms: | N/A | |

### Fees:

| | |
|---|---|
| Promote Fee: | $30,000 |
| Points: | $120,000 |

### Schedule:

Funding Date: LOC will be available within 60-75 banking days of receipt of ICA payment & contract completion.
Estimated Funding Date: August 2023
Delivery: Tranche Schedule TBD

*Est. Repayment Calculation:*

| | | |
|---|---|---|
| LOC: | $2,000,000 | |
| Promote Fee: | $30,000 | *(paid in first tranche)* |
| Points: | $120,000 | *(paid in first tranche)* |

**Total Princple AMOUNT: $2,150,000**

## VELANOS PRINCIPAL CAPITAL

This approval expires on July 31st, 2023 5pm ET and is subject to the following:

- Client Information Summary (CIS) completion in full and this terms and contingent commitment letter, both signed by primary decision executor.
- All soft costs, including by not limited to appraisals, due diligence, insurance etc., to be paid by Client.
- Funding is subject to our complete review of the transaction and collateral.
- Provider reserves the right to amend or add any requirements or LOC conditions at its sole discretion.

Terms & Conditions

This Letter is intended solely as a basis for negotiation between Lender and Borrower of mutually satisfactory definitive documentation relating to a potential LOC by Provider to Client (the LOC is subject to the foregoing the parties agree as follows:

1.    Definitive Documentation. As promptly as reasonably practicable following the execution and delivery of this Letter, the parties (and their respective legal counsel, if necessary) will commence preparation of definitive documents for the LOC. The definitive agreements and other documentation for the LOC (collectively, the "LOC Documents") will be based upon the terms set forth in this document.

2.    Due Diligence. Lender will continue to engage in underwriting and due diligence of Borrower and the scope related to the LOC. Borrower shall provide information to Lender relevant to the LOC in order that Lender may have the opportunity to conduct customary and appropriate underwriting and due diligence as Lender may deem necessary or desirable in connection with its evaluation of the LOC. In the event that information contained in this letter is found to be inaccurate, the Lender at its sole discretion may update the terms or void this letter completely.

3.    Non-Binding. This Letter has been prepared and executed to serve as an aid to the negotiation, preparation and execution of the LOC Documents. Borrower and Lender have mutually discussed the proposed terms of the LOC Documents without Lender's benefit of complete underwriting and due diligence investigation. Therefore, the terms and conditions of this Letter are subject to, among other things, further due diligence investigation by Lender. Except for the provisions of Sections 2, 3, 4, and, hereof (which are intended to be legally binding on the parties hereto), this Letter is not intended to constitute a binding contract on either party, and neither party will be liable to the other party due to any failure to enter into any LOC Document. No past or future action, course of conduct or failure to act relating to the LOC, or relating to the negotiation of the terms of the LOC or the LOC Documents will give rise to or serve as a basis for any obligation or other liability on the part of either party.

4.    Governing Law. This Letter is governed by the laws of the State of Texas, in Tarrant County without regard to its conflicts of law rules.

5.    Legal Authority. Borrower and Lender each represents that the respective person executing this Letter on its behalf has the legal authority to enter into this Letter based on the relevant governing documents of each party.

Please contact your representative if you have any questions regarding this approval.

Regards,

By: _____

Joshua Wearmouth

Managing Principal

Velanos Principal Capital, Inc

By: _____

Name: Donald Klein

Title: Managing Principal

Company: DW Klein & Co., LLC

Date: 8/10/2023

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS – DALLAS DIVISION

| | | |
|---|---|---|
| DONALD W. KLEIN, Individually, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. _____ |
| VELANOS PRINCIPAL CAPITAL INC.; | § | |
| NORDIC TRUST ALLIANCE KB; | § | |
| JAMES WILLIAM BYRD; | § | |
| DANIEL FERNANDEZ ROJO FILHO; | § | |
| ESTATE OF JAMES WILLIAM BYRD; | § | |
| JOSHUA WEARMOUTH | § | |
| LYNDA K BYRD, Successor-in-Interest, | § | |
| LYNDA K. BYRD, Individually, | § | |
| Defendants. | § | |

**EXHIBIT E**

**Docket Sheet – *Hantash v. Byrd*, N.D. Tex. No. 3:24-cv-02392**

*Description:* PACER docket print-out demonstrating ongoing, parallel RICO claims against overlapping defendants (pattern/continuity evidence).

1

**EXHIBIT E-1**

**Complaint *Hantash v. Byrd*, N.D. Tex. No. 3:24-cv-02392**

*Description:* PACER docket print-out demonstrating ongoing, parallel RICO claims against overlapping defendants (pattern/continuity evidence).

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| BASIL M. HANTASH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES WILLIAM BYRD, JOSHUA | § | Civil Action No. 24-2392 |
| MATTHEW WEARMOUTH, KEVIN | § | |
| ROBERT GILLESPIE, WALDON | § | |
| FENSTER, DANIEL FERNANDES ROJO | § | |
| FILHO, HERIBERTO CANDELARIO | § | Jury Trial Demanded |
| PEREZ VALDES, DEAL EXCHANGE, | § | |
| LLC, SOTERIA GROUP, LLC, and | § | |
| NORDIC TRUST ALLIANCE KB, LLC, | § | |
| | § | |
| *Defendants.* | § | |

**ORIGINAL COMPLAINT**

Plaintiff Dr. Basil M. Hantash ("Plaintiff" or "Hantash") files this Original Complaint against Defendants James William Byrd, Joshua Matthew Wearmouth, Kevin Robert Gillespie, Waldon Fenster, Daniel Fernandes Rojo Filho, Heriberto Candelario Perez Valdes, Deal Exchange, LLC, Soteria Group, LLC, and Nordic Trust Alliance KB, LLC (collectively, "Defendants"), and alleges as follows:

**SUMMARY OF THE ACTION**

1.    Defendants are members of a criminal enterprise engaged exclusively in defrauding individuals out of their hard-earned money through a variety of investment scams. In 2023, Defendants James Willia Byrd, Joshua Wearmouth, and their accomplices, directly and through Velanos Principal Capital Inc. ("Velanos"), an entity Mr. Byrd and Mr. Wearmouth control, defrauded Plaintiff Hantash out of $4 million using an illegal scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.     Defendants represented to Dr. Hantash, verbally and in writing, that Velanos could procure one or more standby letters of credit ("SBLC"), which Velanos would then sell at a significant profit in pre-arranged trades. The profit from that sale would then be used to purchase additional SBLCs that would again be sold in pre-arranged trades at additional significant profit.

3.     Byrd and Wearmouth told Dr. Hantash he needed to front the cash to purchase the SBLCs. For their efforts, Dr. Hantash and Velanos would both experience incredible returns from their investments in a short period of time. Defendants represented to Dr. Hantash that the SBLC investment presented absolutely no risk of loss to Dr. Hantash's capital contribution.

4.     Based on these representations, Dr. Hantash invested a total of $4 million in a joint venture with Velanos. Mr. Byrd, Mr. Wearmouth, and their accomplices informed Dr. Hantash that his capital would generate a return of $20 million, including his original capital contribution, within 90 days.

5.     To keep the scheme going and to forestall legal action against them, Defendants falsely represented to Dr. Hantash that the investment was successful and that payments of the proceeds to Dr. Hantash were imminent and/or had already been made. Defendants even created a fake bank, fake bank websites, fake wire confirmations, and other detailed falsehoods to mislead Dr. Hantash while absconding with his money.

6.     In truth, Defendants never obtained SBLCs with Dr. Hantash's capital, never earned the promised returns in a trading program, never paid any profits to Dr. Hantash, and never intended to do so. They stole his money.

## JURISDICTION

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under 18 U.S.C. §§ 1961 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO").

8.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs,

and because Plaintiff and Defendants share no common citizenship.

9.      This Court has supplemental jurisdiction over the state-law claims in this action

pursuant to 28 U.S.C. § 1367 because the state-law claims arise from the same case or controversy

as the claims over which this Court has original jurisdiction.

10.     This Court has personal jurisdiction over Mr. Byrd because he is domiciled in the

state of Texas.

11.     Pursuant to 18 U.S.C. § 1964, this Court has personal jurisdiction over all other

Defendants because this Court has personal jurisdiction over Mr. Byrd and the ends of justice

require that other parties residing in any other district be brought before the Court.

## VENUE

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because this is the

judicial district in which Mr. Byrd resides.

13.     Pursuant to 18 U.S.C. § 1965, venue is proper in this district as to the defendants

residing outside of this judicial district because venue is proper for Mr. Byrd and the ends of justice

require that all other parties residing in any other district be brought before the Court.

## PARTIES AND RELEVANT NON-PARTIES

14.     Plaintiff Dr. Basil M. Hantash is an individual who resides in San Juan, Puerto Rico.

Plaintiff is a citizen of Puerto Rico.

## I.      DEFENDANTS.

15.     Defendant James William Byrd (a/k/a Wilbur Byrd a/k/a Will Byrd) is an individual

who resides in Dallas, Texas and may be served with process at 5665 Arapaho Road, Unit 2828,

Dallas, Texas 75248 or wherever he may be found. Mr. Byrd is a citizen of Texas.

16.     Defendant Waldon Fenster is an individual who resides in Downers Grove, Illinois and may be served with process at 4740 Saratoga Avenue, Downers Grove, Illinois 60515 or wherever he may be found. Mr. Fenster is a citizen of Illinois.

17.     Defendant Kevin Robert Gillespie is an individual who resides in Carpentersville, Illinois and may be served with process at 6625 Majestic Way, Carpentersville, Illinois 60110 or wherever he may be found. Mr. Gillespie is a citizen of Illinois.

18.     Defendant Joshua Matthew Wearmouth is an individual who resides in Newport Beach, California and may be served with process at 1226 Newberg Commons, San Jacinto, California 92582 or wherever he may be found. Mr. Wearmouth is a citizen of California.

19.     Defendant Daniel Fernandes Rojo Filho (a/k/a Danyel Fernandes) is an individual who resides in Clermont, Florida and may be served with process at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746 or wherever he may be found. Mr. Fernandes is a citizen of Florida.

20.     Defendant Heriberto Candelario Perez Valdes (a/k/a Eddie Perez) is an individual who resides in Miami Gardens, Florida and may be served with process at 18201 NW 32nd Avenue, Miami Gardens, Florida 33056 or wherever he may be found. Mr. Perez is a citizen of Florida.

21.     Defendant Deal Exchange, LLC is a Wyoming limited liability company with its principal office at 1718 Capitol Avenue, Cheyenne, Wyoming 82001. Deal Exchange, LLC may be served by and through its registered agent, Anderson Registered Agents, at 1716 Capitol Avenue, Suite 100, Cheyenne, Wyoming 82001. Deal Exchange, LLC is a citizen of Wyoming.

22.     Defendant Soteria Group, LLC is a Texas limited liability company with its principal office at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC

may be served by and through its registered agent, Seth Hicks, at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC is a citizen of Texas.

23.     Defendant Nordic Trust Alliance KB, LLC ("NTA") is a Florida limited liability company with its principal office at 121 S Orange Avenue, Suite 1500, Orlando, Florida 32801. Nordic Trust Alliance KB, LLC may be served by and through its registered agent, Ester G. Nascimento Ramos, at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746. Nordic Trust Alliance KB, LLC is a citizen of Florida.

## II.     RELEVANT NON-PARTIES.

24.     Velanos Principal Capital Inc. ("Velanos") is a Canadian corporation with its principal place of business at 120 Adelaid Street West, Suite 2500, Toronto, Ontario M5H 1T1, Canada. Velanos was the entity used by Defendants to purportedly invest Dr. Hantash's money in the SBLCs.

25.     Escape Therapeutics, Inc. is a California corporation. Escape Therapeutics was founded by Dr. Hantash and is the entity for which Dr. Hantash sought capital to fund its projects.

26.     John P. Ferrick is an individual who resides in Northbrook, Illinois. Mr. Ferrick is a member of Escape Therapeutics' Board and was tasked with seeking capital sources at Dr. Hantash's request.

27.     Kevin J. Cawley is an individual who resides in Downers Grove, Illinois. Mr. Cawley is a business associate of Mr. Ferrick and introduced Mr. Ferrick and Dr. Hantash to Deal Exchange.

28.     Martin Brian Tobias Gibbins (a/k/a Martin Gibbons) is an individual who resides in England. Mr. Gibbins is a purported banker with residences in both the United Kingdom and the United Arab Emirates. Mr. Gibbins served as an alleged reference for Velanos' investment strategy to coax Dr. Hantash into parting with his money.

29.    Jasotha Ulaganathan (a/k/a Jasotha Ulganathan) is Defendant Velanos Principal
Capital Inc.'s purported banking officer. Jasotha Ulaganathan is located in Canada.

30.    Edward Koziel is NTA's purported compliance officer. Dr. Hantash attempted to
contact Mr. Koziel regarding his issues with NTA's banking system via his listed email address
and phone number.

31.    James A. Hutchinson is purportedly on the board of directors for Velanos. Dr.
Hantash contacted Mr. Hutchinson regarding the status of his investment after he uncovered the
criminal scheme.

32.    Lucia Harris (a/k/a Lucia De Faima Alves Do Couto a/k/a Lucia Alves) is and/or
was on the board of directors for Velanos. Ms. Harris corresponded with Dr. Hantash regarding the
status of his investment after he uncovered the criminal scheme.

## GENERAL ALLEGATIONS

33.    Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics,
Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the
commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks
to revolutionize the treatment of numerous medical diseases that require cell and/or organ
replacement such as type I diabetes, Parkinson's, leukemia, and more.

34.    In January 2023, Dr. Hantash sought project financing of approximately $20 million
to fund commercial development of new biotechnologies with his company, Escape Therapeutics.

35.    Through mutual connections, Dr. Hantash was introduced to Mr. Fenster, who, in
turn, introduced Dr. Hantash to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie. These individuals
would turn out to be the main actors in a criminal enterprise designed to deprive wealthy investors
of their hard-earned money and pad their own pockets.

36.     Both verbally and in writing, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie represented to Dr. Hantash that, through their investment entity, Velanos, they regularly raised millions of dollars in capital through financial instruments known as standby letters of credit ("SBLCs").

37.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie had specialized experience, knowledge, and connections that allowed them to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

38.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie proposed a joint venture between Dr. Hantash and Velanos whereby Velanos, using capital supplied by Dr. Hantash, would initiate a series of SBLC trades that would generate massive profits for Dr. Hantash and Velanos together.

39.     Over the course of a few months, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie slowly convinced Dr. Hantash of the investment's validity. They even assured Dr. Hantash that the SBLC investment posed no risk of loss to Dr. Hantash.

40.     Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie assured Dr. Hantash that the SBLC investment would return Dr. Hantash's capital and distribute profits to Dr. Hantash of up to 500% of the principal investment within 90 days. By way of example, Dr. Hantash could raise the $20 million he needed for his research with only a $4 million principal investment in merely 90 days.

41.     To further convince Dr. Hantash to "invest" $4 million, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie introduced Dr. Hantash to a supposed Velanos investor named Martin Gibbins. Dr. Hantash spoke with Mr. Gibbins over the telephone. Mr. Gibbins spoke highly of Velanos and assured him that the Defendants' representations were all accurate.

42. On or about April 12, 2023, Dr. Hantash and Velanos executed a Joint Venture Agreement ("JV Agreement") concerning the SBLC investment. Mr. Wearmouth executed the JV Agreement on behalf of Velanos.

43. The JV Agreement required Dr. Hantash to contribute $4 million in capital to the joint venture, which Velanos would use to engage in its planned transactions involving SBLCs.

44. Dr. Hantash's expectation under the JV Agreement is memorialized through the agreement itself and numerous emails and text messages between the individuals involved.

45. Dr. Hantash never received any of the profits promised from the JV Agreement nor the return of his original capital contributions.

46. To contribute the required $4 million to the joint venture, Dr. Hantash obtained a loan against securities in his brokerage account. In addition to never receiving his promised profits, Dr. Hantash incurred millions of dollars in losses pursuant to covering margin calls associated with the loan on his brokerage account.

47. Since May 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie have repeatedly and falsely represented certain transfers, returning multi-million dollar payments to Dr. Hantash, have occurred. This was, and remains, false.

48. In June 2023, Dr. Hantash began raising concerns about the distributions he was owed under the JV Agreement. Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the SBLC investment.

49. Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie informed Dr. Hantash that his money was safe and in an account at Nordic Trust Alliance ("NTA"), a supposedly U.S.-licensed bank. This would also prove to be false. Accordingly, Dr. Hantash also requested a personal checking

account be created for him at the NTA bank. Dr. Hantash completed the appropriate paperwork and an account was purportedly created for him with NTA.

50.    Dr. Hantash immediately attempted to initiate a transfer of his funds from the NTA account to his prior bank account from which the funds originated. The transfer was cancelled.

51.    After going back and forth with NTA's representative, NTA's website eventually reflected that the transfer had been executed. But no money was ever transferred to Dr. Hantash's account.

52.    Dr. Hantash sent multiple requests through NTA's online portal and via email about the status of its outgoing wire transfers. The only responses he received were non-substantive. Eventually, the NTA line of communication went silent.

53.    After Dr. Hantash's numerous emails and attempts to contact Mr. Byrd, Mr. Byrd ultimately admitted that NTA was not a U.S.-licensed bank, but instead a foreign bank. This also proved false.

54.    NTA was just another cog in the criminal enterprise orchestrated to steal Dr. Hantash's money.

55.    Dr. Hantash's reliance on these false statements and misrepresentations was reasonable given the lengths to which Defendants went to give their false statements and misrepresentations an air of legitimacy. At the time Dr. Hantash committed his capital to the SBLC investment, there was no reason to question the validity of the investment or any of the Defendants' statements about Velanos' ability and intention to distribute profits to Dr. Hantash and return his capital contributions.

56.    Dr. Hantash relied on Defendants' false statements and misrepresentations to his substantial detriment in that he was personally deprived of $4 million and his company, Escape

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **Page 9 of 44**

Therapeutics, was unable to raise the capital it needs to perform life-saving medical research and development.

## DETAILED ALLEGATIONS

57.    Beginning in at least July 2020, and continuing through at least March 2024, Defendants, and others known and unknown, were associated together in fact as an enterprise for the common purpose of enriching its members and associates, through the repeated commission of diverse criminal acts set forth below.

## GOAL AND PURPOSE

58.    The goal of this conspiracy and the purpose of the Defendants' criminal enterprise was to scam Dr. Hantash out of Four Million Dollars ($4,000,000) by taking advantage of Escape Therapeutics' need for financing to fund its lifesaving, industry-shaping research and instead line its members' and its associates' pockets through repeated commissions of criminal acts such as wire fraud, and more.

## ENTERPRISE

59.    Defendants' enterprise ("SBLC Syndicate") was itself not a legal entity, but an association in fact of persons, sometimes acting through legal entities at the direction of Mr. Byrd.

60.    Mr. Byrd knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. Mr. Byrd also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details alleged investment opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. By way of example, Mr. Byrd misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Byrd misrepresented that the investment existed in the first place and that such profits were realistic.

Mr. Byrd made these misrepresentations to Dr. Hantash with knowledge that Dr. Hantash needed a significant amount of money to fund his life-saving medical research.

61.     For most of the scheme, Mr. Byrd represented that he was the controlling party of Velanos, emailing consistently from a Velanos email address. Once Dr. Hantash began to ask questions and sent Velanos a notice of default under the JV Agreement, Mr. Byrd stated he was not a member of Velanos. This was contrary to everything Mr. Byrd had told Dr. Hantash previously. Thus, at a minimum, one of these statements was a blatant misrepresentation. Mr. Byrd also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. Nevertheless, Mr. Byrd eventually introduced Dr. Hantash to Mr. Gibbins, an alleged investor, to further induce Dr. Hantash to participate in the scheme. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Mr. Byrd also misrepresented to Mr. Hantash that NTA was a licensed bank in the United States. Mr. Byrd made repeated misrepresentations to Dr. Hantash regarding the status of his investment, the profits to be obtained therefrom, the location of his funds, and the timeline of the alleged investment. Eventually, Mr. Byrd stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Byrd accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Byrd committed these acts and others to enrich himself and to Dr. Hantash's detriment.

62.     Mr. Wearmouth knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. As a member of Velanos, Mr. Wearmouth was instrumental in perpetrating the fraud and misrepresentations critical to the success of the SBLC Syndicate's scheme. Mr. Wearmouth also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details of the alleged investment

opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. Among examples others, Mr. Wearmouth misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Wearmouth also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Nevertheless, Mr. Wearmouth assisted in arranging for Dr. Hantash to speak with Mr. Gibbins, an alleged previous investor with Velanos. Mr. Wearmouth also misrepresented to Dr. Hantash that the per trade profit of the investment was approximately 55%. Eventually, Mr. Wearmouth stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Wearmouth accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Wearmouth committed these acts and others to enrich himself and to Dr. Hantash's detriment.

63.     Mr. Fenster knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Deal Exchange, LLC Mr. Fenster was instrumental in connecting Dr. Hantash with Mr. Gillespie and Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Fenster perpetrated the fraud by assisting Dr. Hantash in completing the debt intake application on Deal Exchange's website. This form allegedly vetted Dr. Hantash as a proper investor for the alleged investment opportunity. Mr. Fenster furthered the SBLC Syndicate's main goal by informing Dr. Hantash that Soteria Group, LLC was interested in the opportunity and introduced Dr. Hantash to Mr. Gillespie. Mr. Fenster further misrepresented that Soteria had completed several successful financing deals. Thus, Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness in furtherance of the SBLC Syndicate's goal. Mr. Fenster accomplished this goal through numerous phone calls, emails, text messages, and other

forms of electronic communication. Mr. Fenster committed these acts and others to enrich himself and to Dr. Hantash's detriment.

64.    Mr. Gillespie knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Soteria, Mr. Gillespie was instrumental in connecting Dr. Hantash with Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Gillespie initially introduced Mr. Byrd to Dr. Hantash. Mr. Gillespie, along with Mr. Byrd, was responsible for informing Dr. Hantash of the SBLC investment scheme. Mr. Gillespie, through multiple communications, continuously pressured Dr. Hantash into investing his money into the SBLC Syndicate's scheme. Mr. Gillespie also represented to Dr. Hantash that it would be impossible for him to meet with prior investors. Mr. Gillespie also repeatedly assured Dr. Hantash that he and Velanos would share equally in the profits generated from the investment. Of course, this proved false. Mr. Gillespie also repeatedly misinformed Dr. Hantash that his first distribution would be fulfilled. Then, once an account freeze was in place, Mr. Gillespie misrepresented to Mr. Hantash that Mr. Byrd, Mr. Wearmouth, and Mr. Fernandes were working with the Federal Reserve and other organizations to resolve the issues. Mr. Gillespie accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Gillespie committed these acts and others to enrich himself and to Dr. Hantash's detriment.

65.    Mr. Fernandes knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged administrator at NTA, Mr. Fernandes was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. Mr. Fernandes allegedly resolved an issue with the classification of Dr. Hantash's account at NTA to further uphold the façade that NTA was a functioning U.S. bank. Following Dr. Hantash's

requests regarding the anticipated fulfillment of his first and second distributions, Mr. Fernandes never responded in clear violation of his alleged duties as an alleged NTA administrator. Mr. Fernandes further failed to respond to Dr. Hantash's messages on the NTA portal system, phone calls, voicemails, or emails. Mr. Fernandes likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Mr. Fernandes accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Fernandes committed these acts and others to enrich himself and to Dr. Hantash's detriment.

66.    Mr. Perez knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged director of NTA, Mr. Perez was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. After experiencing errors in NTA's banking system, Dr. Hantash attempted to call Edward Koziel, NTA's purported compliance officer. Instead, Mr. Perez answered the call from Dr. Hantash. Mr. Perez informed Dr. Hantash that he would forward his complaints to NTA's Swedish office to resolve his issues. Mr. Perez likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Consequently, NTA likely does not have any Swedish office or main office of operations. Mr. Perez accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Perez committed these acts and others to enrich himself and to Dr. Hantash's detriment.

67.    The SBLC Syndicate used Deal Exchange, Soteria, Velanos, and NTA to introduce, coerce, and trap Dr. Hantash into the SBLC Syndicate's investment racket. All four entities held different roles within the SBLC Syndicate. Deal Exchange, under Mr. Fenster's hand, purported to offer private equity funds to off-market assets for acquisition. In reality, Deal Exchange was used

to source victims for the SBLC Syndicate. Soteria, under Mr. Byrd and Mr. Gillespie's hands, was used to introduce Dr. Hantash and further vet him as an ideal candidate to defraud through the alleged investments offered. Velanos operated as the vehicle through which Dr. Hantash was defrauded of his $4 million. NTA, under Mr. Fernandes's hand, was used to perpetrate and prolong the fraud in an attempt to convince Dr. Hantash that everything was operating as normal.

## PATTERN OF CRIMINAL ACTIVITY

### I.    Hantash Sought Capital to Fund Life-Saving Medical Research.

68.    Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics, Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks to revolutionize the treatment of numerous medical diseases that require cell and/or organ replacement such as type I diabetes, Parkinson's, leukemia, and more.

69.    In January 2023, Dr. Hantash sought project financing of approximately $20 million to fund commercial development of new biotechnologies. Accordingly, Dr. Hantash tasked a member of Escape Therapeutics' Board of Directors, John P. Ferrick, with finding project financing institutions that work with biotechnology companies.

70.    Mr. Ferrick spoke with Kevin Cawley on the phone regarding Escape Therapeutics' need for financing. Mr. Cawley informed Mr. Ferrick that he would connect Escape Therapeutics with Waldon Fenster at Deal Exchange, LLC ("Deal Exchange").

71.    On or about January 26, 2023, Mr. Cawley emailed Mr. Fenster to schedule a phone call with Mr. Ferrick to inform him of a potential biotechnology opportunity.

72.    Criminal Act No. 1-2: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about January 26, 2023, Mr. Fenster sent an email to Mr. Ferrick requesting availability in Mr. Ferrick's

schedule. The same day, Mr. Fenster sent a second email to Mr. Ferrick and confirmed that he would call the following morning. Mr. Fenster transmitted these communications by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

73.     Deal Exchange purports to connect private equity funds to off-market assets for acquisition. In this instance, Deal Exchange claimed it could link Escape Therapeutics, who needed project funding, with entities that offer capital.

74.     Criminal Act No. 3: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about January 30, 2023, Mr. Fenster sent an email to Mr. Ferrick providing a link to Deal Exchange's intake form. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

75.     Following additional phone calls with Mr. Fenster, Mr. Ferrick and Dr. Hantash completed the debt intake application on Deal Exchange's website.

**II.     Hantash is Introduced to the Criminal SBLC Syndicate.**

76.     Criminal Act No. 4: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about February 8, 2023, Mr. Fenster emailed Mr. Ferrick and informed him that Soteria Group, LLC ("Soteria") was interested in having conversations about financing a debt round for the opportunity. In doing so, Mr. Fenster introduced Kevin Robert Gillespie. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

77.    Criminal Act No. 5: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about February 13, 2023, Mr. Gillespie formally met Dr. Hantash via Zoom. This meeting served as the first in a long stream of illicit actions Mr. Gillespie would undertake to defraud Dr. Hantash from his property.

78.    Mr. Gillespie represented he was a broker for Soteria. Mr. Gillespie informed Dr. Hantash of a program that grows principal to a generate a desired amount of project financing without incurring debt. Encouraged by Mr. Gillespie's suggested program, Dr. Hantash and Escape Therapeutics continued the process. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

79.    Criminal Act No. 6: Violation of 18 U.S.C. § 1343 (Wire Fraud). During this Zoom call on or about February 13, 2023, Mr. Fenster represented and personally confirmed to Mr. Ferrick and Dr. Hantash that Soteria had completed several project-financing deals, including Mr. Fenster's own Cannabis company which received its desired project financing. Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness. Mr. Fenster transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

80.    Criminal Act No. 7: Violation of 18 U.S.C. § 1343 (Wire Fraud). Following their first Zoom meeting, Dr. Hantash provided Mr. Gillespie with a term sheet. On or about February 16, 2023, Mr. Gillespie emailed Dr. Hantash to inform him that the term sheet was approved. Mr. Gillespie also provided Dr. Hantash with a checklist of documents needed to move forward. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in

furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

81.    Criminal Act No. 8: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about February 19, 2023, Mr. Fenster emailed Dr. Hantash to say that the purported term sheet had been approved. Mr. Fenster also asked Dr. Hantash if he had any questions regarding the term sheet. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

82.    Criminal Act No. 9: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about February 26, 2023, Mr. Gillespie followed up with Dr. Hantash via email to ask if the latter had any questions regarding the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

83.    Criminal Act No. 10: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 3, 2023, Mr. Gillespie informed Dr. Hantash that he was still working to accommodate his requests on the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

84.    Criminal Acts Nos. 11-12: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about March 13, 2023, Dr. Hantash coordinated with Mr. Gillespie in drafting and signing a new term sheet as well as providing the checklist of documents needed. Specifically, Mr. Gillespie emailed Dr. Hantash that he would provide a new term sheet the same day. Approximately three hours later, Mr. Gillespie sent a separate email to Dr. Hantash with the new term sheet. Mr.

Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

85.     Criminal Acts Nos. 13-15: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about March 15, 2023, Mr. Gillespie emailed Dr. Hantash to arrange a phone to explain the details of the investment opportunities with Soteria. Two hours later, Mr. Gillespie emailed Dr. Hantash with an invite for a call titled "SBLC Introduction." The same day, Mr. Gillespie and Dr. Hantash had call wherein Mr. Gillespie explained the details of the SBLC investment.  Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

86.     Criminal Act No. 16: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 19, 2023, Mr. Gillespie provided Dr. Hantash with a template Letter of Intent to review. Mr. Gillespie requested that Dr. Hantash customize the details of the template Letter of Intent and return the document. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

87.     Criminal Act No. 17: Violation of 18 U.S.C. § 1343 (Wire Fraud). Next, on or about March 21, 2023, Mr. Gillespie emailed an invite for a call titled SBLC Procedures with the purpose to introduce Dr. Hantash to James William Byrd, the purported owner of Soteria. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

88.     Criminal Act No. 18: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 21, 2023, Mr. Bryd explained that his separate company, Velanos Principal Capital ("Velanos") would be able to satisfy Escape Therapeutics' need for project financing.

89.     Mr. Byrd represented that Velanos had a $500 billion quarterly allocation to purchase new $100 million notes for $44 million and resell them for a profit over the course of one to four days. Mr. Byrd also explained that Velanos always had a buyer for the note identified prior to making the initial purchase. This appeared to be the exact thing Escape Therapeutics and Dr. Hantash needed to fund their life-saving research. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

**III.     The SBLC Syndicate Deceives Hantash with a Fake Prior Investor.**

90.     Criminal Acts Nos. 19-20: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 22, 2023, Dr. Hantash had a follow up phone call with Mr. Byrd and his partner, Joshua M. Wearmouth. Mr. Byrd and Mr. Wearmouth explained how their program worked and how Dr. Hantash could choose the investment duration and proposed desired return. Mr. Byrd and Mr. Wearmouth also indicated that there was absolutely zero downside risk. Mr. Wearmouth and Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

91.     On or about March 24, 2023, Dr. Hantash, after customizing the details as Mr. Gillespie requested, returned the Letter of Intent to Mr. Byrd.

92.     Criminal Act No. 21: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 28, 2023, Mr. Gillespie emailed Dr. Hantash to work out certain details of their agreement including the saturation point, personal information, and the sum to be invested. Mr. Gillespie

transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

93.     Criminal Act No. 22: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 22, 2023, Mr. Byrd and Mr. Wearmouth encouraged Dr. Hantash through phone calls to invest prior to March 31, 2023, because Mr. Wearmouth would close off the deal to new investments lower than $44 million after that date. Mr. Byrd and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

94.     Criminal Act No. 23: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 28, 2023, Mr. Wearmouth, as an agent of Velanos, caused Docusign to send Dr. Hantash a copy of a Joint Venture Agreement ("JV Agreement") to sign. Finding several errors in the draft JV Agreement, Dr. Hantash emailed Mr. Wearmouth requesting certain corrections. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

95.     Criminal Acts Nos. 24-26: Violation of 18 U.S.C. § 1343 (Wire Fraud). In response, Dr. Hantash requested to speak to any references regarding the program as part of his normal due diligence. On or about March 29, 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie all indicated via text messages to Dr. Hantash that fulfilling such a request was not possible because no investor wants to speak about their private financial affairs for an invite-only program like theirs. Nevertheless, they said would attempt to find a reference with whom Dr. Hantash could discuss the investment. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted this communication by

means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

96.    Criminal Act No. 27: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about March 31, 2023, Mr. Byrd ultimately acquiesced and introduced Mr. Gibbins to Dr. Hantash via text. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

97.    On or about March 31, 2023, Dr. Hantash spoke with Mr. Gibbins. Mr. Gibbins described himself as a long-time banker very familiar with the type of instruments Velanos was advertising to Dr. Hantash. Mr. Gibbins confirmed that his group invested $10 million and, 90 days later, received $10 million in profit in addition to their $10 million initial capital investment. Mr. Gibbins also indicated that his group would be investing a second round with Velanos. Mr. Gibbins transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

98.    The next day, Dr. Hantash attempted to call Mr. Gibbins with a few follow-up questions and clarifications regarding tax treatment of the program profits, but Mr. Gibbins did not answer the phone or reply to Dr. Hantash's messages.

99.    Criminal Acts Nos. 28-29: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 3 and 4, 2023, Mr. Byrd and Mr. Gillespie called Dr. Hantash regarding his decision to invest in the program and again applied pressure to commit to the investment quickly. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

100.     Criminal Act No. 30: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April

3, 2023, Dr. Hantash expressed that he had additional questions for Mr. Gibbins. In response, Mr.

Byrd explained via phone that Mr. Gibbins was in the hospital for a cardiac-related issue and not

able to answer his call. Mr. Byrd transmitted this communication by means of interstate wire to

Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent

pretenses, representations, or promises.

101.     Criminal Acts Nos. 31-34: Violation of 18 U.S.C. § 1343 (Wire Fraud). Between

approximately April 5 and April 13, 2023, Dr. Hantash went back and forth with Mr. Byrd and Mr.

Wearmouth over email rectifying a laundry list of questions and items that needed to be fixed in

the JV Agreement before he would sign. Mr. Byrd responded and answered all of Dr. Hantash's

questions to assuage his concerns – further inducing Dr. Hantash to enter the fraudulent JV

Agreement. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash

in furtherance of his scheme to obtain money by means of false or fraudulent pretenses,

representations, or promises.

**IV.     Hantash Invests His Money with the SBLC Syndicate.**

102.     Criminal Act No. 35: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April

12, 2023, Velanos, through its agents, caused Docusign to transmit the final version of the JV

Agreement to Dr. Hantash. The same day, Dr. Hantash and Velanos executed the JV Agreement

whereby Dr. Hantash would contribute Four Million Dollars ($4,000,000) in capital to Velanos.

The JV Agreement stipulated that Dr. Hantash would receive 50% of the proceeds from the $4

million investment approximately 30 days after sending the funds and a second distribution of up

to $16 million by July 13, 2023 – 90 calendar days after commencing the investment. Velanos,

through its agents, transmitted these communications by means of interstate wire to Dr. Hantash

in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

103.    On or about April 14, 2023, Dr. Hantash deposited, in two separate wires of equal magnitude, Four Million Dollars ($4,000,000) in committed capital with Velanos pursuant to the JV Agreement.

104.    Criminal Act No. 36: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 29, 2023, Mr. Bryd, via phone call, represented to Dr. Hantash that he had acquired two international banks to receive his funds. One of these banks was a Swedish entity named Nordic Trust Alliance KB ("NTA"). Mr. Bryd represented that NTA was a licensed U.S. Bank. This would later prove to be completely false. Upon information and belief, the second entity is AGFC Capital Trust ("AGFC"). AGFC has a Geneva location but does not appear to be a legitimate bank. Instead, both NTA and AGFC appear to be lead-generating for the purpose of identifying more victims of Defendants' scheme. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

105.    Criminal Act No. 37: Violation of 18 U.S.C. § 1343 (Wire Fraud). On April 24, 2023, Dr. Hantash emailed Mr. Gillespie regarding the underwriting period for the JV Agreement. Mr. Gillespie further reassured Dr. Hantash that the underwriting had already occurred and that all was going well with the investment plan. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

## V.    Hantash Began Probing the SBLC Syndicate Regarding Discrepancies He Noticed.

106.    On or about May 1, 2023, and following Dr. Hantash depositing his capital, Dr. Hantash began to notice discrepancies between what Mr. Gillespie and Mr. Byrd were telling him

regarding the mechanics of the investment. Accordingly, Dr. Hantash emailed Mr. Gillespie to request clarification on the details of his investment.

107.    Criminal Act No. 38: Violations of 18 U.S.C. § 1343 (Wire Fraud). On May 2, 2023, Mr. Gillespie responded to placate Dr. Hantash's concerns. Mr. Gillespie responded to each of Dr. Hantash's five concerns and provided excuses such as typographical errors in the JV Agreement, explanations of how funds would be transferred to Escape Therapeutics, and the original draw schedule of three tranches for the investment. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

108.    Criminal Acts Nos. 39-41: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about May 10, 2023, Dr. Hantash requested and had another phone call with Mr. Gillespie. On or about May 11, 2023, and during this call, Mr. Wearmouth touted that the per trade profit of the investment was approximately 55%. Mr. Gillespie also assured Dr. Hantash that him and Velanos would share equally in the profits generated from the investment. To the contrary, Mr. Byrd stated Dr. Hantash's profits were capped but Velanos could continue earning profits using Dr. Hantash's capital.

109.    In response to Dr. Hantash's concerns, Mr. Gillespie repeatedly assured Dr. Hantash that him and Velanos would share the same, identical profits from the investment. Mr. Byrd maintained his position that Velanos could continue using Dr. Hantash's capital after the investment reached a saturation point for Velanos's pure profit.

110.    Disturbed by Mr. Gillespie and Mr. Byrd's contradictions, Dr. Hantash requested weekly updates on the trades executed with his capital including the account balance. Dr. Hantash

was entitled to this information under the JV Agreement to allow him to determine when to withdraw his capital.

111.    Mr. Byrd refused to ever provide Dr. Hantash with the requested trade details or account balance figures. Mr. Gillespie also could not furnish this information. Mr. Wearmouth never responded to Dr. Hantash's inquiries. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

112.    Growing more concerned, Dr. Hantash decided to contact Velanos' previous client reference, Mr. Gibbins. Mr. Gibbins never answered Dr. Hantash's calls or responded to his messages.

113.    On or about May 12, 2023, and approximately 30 calendar days after the JV Agreement was executed, Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth regarding opening a bank account of his own so that he can monitor his deposited funds. Dr. Hantash also reminded Mr. Byrd and Mr. Wearmouth of the emotional gravity this investment has and what is at stake. On May 25, 2023, Dr. Hantash followed up with Mr. Byrd and Mr. Wearmouth because he had not yet received a response.

114.    On or about May 30, 2023, and approximately 30 banking days after the JV Agreement was executed, Dr. Hantash inquired regarding the timing of the first distribution and the account balance. The JV Agreement indicated that Dr. Hantash could withdraw from the program within 10 banking days after 30 banking days from execution.

115.    Criminal Act No. 42: Violation of 18 U.S.C. § 1343 (Wire Fraud). Finally, Mr. Gillespie, responded to arrange a phone call set for June 1, 2023. Mr. Gillespie transmitted this

communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

116.    Criminal Act No. 43: Violation of 18 U.S.C. § 1343 (Wire Fraud). During the phone call on or about May 31, 2023, Mr. Byrd responded that 30 banking days had not yet lapsed. Dr. Hantash informed Mr. Byrd that, even with the most generous calculation of days lapsed – 30 days after 10 days after the execution of the JV Agreement (40 days total) – the first distribution of Four Million Dollars ($4,000,000) was due on June 9, 2023. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

117.    On or about June 5, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie asking for an update on the status of his investment.

118.    Criminal Act No. 44-45: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 7, 2023, Mr. Byrd informed Dr. Hantash that he would call him that evening to answer Dr. Hantash's questions. During the phone call, Mr. Byrd and Mr. Gillespie informed Dr. Hantash that the first distribution was forthcoming. This proved to be false. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

119.    On or about June 17, 2023, Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the fund. Dr. Hantash also requested Mr. Byrd create a personal checking account at the NTA bank only if NTA did not have wire limits.

120.    Criminal Act No. 46: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 18, 2023, Dr. Hantash received a bank account application form from Mr. Wearmouth. Interestingly, Mr. Wearmouth's email came from a Velanos domain, not an NTA domain. Nevertheless, Dr. Hantash completed the application. The same day, Dr. Hantash emailed NTA's primary email address to request the bank's fee schedules for outgoing wires. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

121.    On or about June 18, 2023, Dr. Hantash also emailed Mr. Wearmouth to restate Dr. Hantash's intention to act on his rights under the JV Agreement to trade on his investment.

122.    Criminal Act No. 47: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about June 20, 2023, Mr. Wearmouth caused Docusign to send Dr. Hantash a complete bank account application form to sign via email. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

123.    Criminal Act No. 48 Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about June 20, 2023, and upon accessing the account, Dr. Hantash noticed that while the application stated the account would be a private checking account, NTA created a business checking account for Dr. Hantash instead. The business name on the account was Elucent LLC, which is not even Dr. Hantash's company that was party to the JV Agreement. Accordingly, Mr. Wearmouth and NTA, through its agents, caused the transmission of a fake webpage to Dr. Hantash to further their fraudulent scheme. Dr. Hantash informed NTA of this error via email. Mr. Wearmouth and NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

124.     Criminal Act No. 49: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 21, 2023, Dr. Hantash noticed a ledger entry showing $4 million was credited to his NTA account. "Velanos – FST Credit" was listed as the source. NTA, through its agents, had caused a fake webpage to be transmitted to Dr. Hantash to illustrate a fake wire transfer. Dr. Hantash quickly informed Mr. Byrd that he did not instruct any funds to be transferred, but Mr. Byrd failed to address this issue. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

125.     Criminal Act No. 50: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 29, 2023, Dr. Hantash again emailed NTA's email address to request his account be changed from a business account to a personal checking account. NTA's purported admin, Defendant Daniel Fernandes caused the change to be made the same day. In reality, this change meant nothing because the entire account was later revealed to be fake. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

126.     Criminal Act No. 51: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 30, Dr. Hantash attempted to execute an outgoing wire request from his NTA account of $4 million. Dr. Hantash also emailed NTA to request that the outgoing wire transfer be approved immediately. The same day, Dr. Hantash received a private message through the NTA portal that the wire request had been cancelled without providing any explanation. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

127.    Criminal Act No. 52: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about July 1, 2023, Dr. Hantash again attempted to execute an outgoing wire request from his NTA account for $3.99 million. The NTA website displayed that the transfer was executed on July 1, 2023, with an expected receipt date of July 5, 2023. This webpage was fake because no wire transfer had been executed. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

128.    Criminal Act No. 53: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about July 5, 2023, the funds did not arrive. Instead, NTA, through its agents, caused an admin message to appear and indicate that due to a restriction, the funds would now be received on July 13, 2023. This message also turned out to be false because, on or about July 13, 2023, the funds did not arrive. Notably, July 13, 2023, was also the same date on which the *second* distribution was due to Dr. Hantash pursuant to the JV Agreement. Dr. Hantash had yet to receive any funds from his investment. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

129.    Between July 5, and July 13, 2023, Dr. Hantash repeatedly contacted Mr. Byrd to determine whether the JV Agreement would be extended, and the funds would remain in the NTA account. Mr. Byrd never sent any addendum or further directive pursuant to the JV Agreement. Therefore, Dr. Hantash directed the funds from the second distribution to be wired to a non-NTA account.

130.    The purported NTA admin, Mr. Fernandes, never responded to Dr. Hantash's requests to trace the second distribution or the July 1, 2023, transfer of $3.99 million. Mr.

Fernandes did not respond to phone calls, emails, or online messages through the NTA portal system. Dr. Hantash was consistently sent to Mr. Fernandes' voicemail. Mr. Fernandes never responded. Nor did any representative from NTA furnish any documentation or reasoning to support the failed wire transfer.

131.    Criminal Act No. 54: Violation of 18 U.S.C. § 1343 (Wire Fraud). Between June 20 and June 26, 2023, Mr. Byrd contacted Dr. Hantash via phone to provide an explanation for NTA's failure to complete the wire transfer. The only explanation Mr. Byrd was able to provide was that Dr. Hantash should only execute a wire that leaves in the account a portion of the funds received into the NTA account. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

132.    Criminal Acts Nos. 55-56: Violation of 18 U.S.C. § 1343 (Wire Fraud). As his suspicions grew, Dr. Hantash requested a proof of funds for the NTA account. On or about July 21, 2023, Dr. Hantash logged into his NTA portal. Instead of showing $4,000,000 in the account, the NTA portal now showed a balance of only $10,000. The same day, Dr. Hantash initiated a wire to transfer the $10,000 out of the NTA account. NTA, through its agents, caused a private message to be sent to Dr. Hantash through the NTA portal showing that the wire was executed on the same day. The NTA portal displaying a balance of $10,000 and the private message were both fake and/or false and created by NTA to further string Dr. Hantash along. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

133. To date, Dr. Hantash has not received any completed wire transfer for funds leaving the NTA account. The NTA account displays a balance of approximately negative $40 due to bank fees assessed for the account.

## VI. Hantash Sends the SBLC Syndicate a Notice of Breach of Contract Under the Joint Venture Agreement.

134. On or about July 27, 2023, Dr. Hantash sent Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie an email to provide a notice of breach of contract to the JV Agreement. Dr. Hantash's email outlined the multiple deficiencies, breaches, and failures to perform for which Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie were responsible. These breaches included, but were not limited to, failure distribute Dr. Hantash's funds as anticipated, failure to allow Dr. Hantash to direct his funds per his discretion, and failure to notify Dr. Hantash with any details regarding his investment. Dr. Hantash's email also provided notice to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie of the scope of his anticipated damages, but directly and indirectly related to the breach.

135. <u>Criminal Act No. 57: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about July 27, 2023, Dr. Hantash also emailed Edward Koziel, NTA's purported compliance officer regarding the wires that were not executed and the deeply concerning fact his account now showed a $0 balance. Upon calling his listed number, the individual muttered his name – "Eddie Perez." The individual answered startled and, after gathering his thoughts, told Dr. Hantash that he would send a message to NTA's office in Sweden to contact Dr. Hantash and resolve the issues. Dr. Hantash later learned that Eddie Perez was an alias for Heriberto Candelario Perez Valdes, a Director of NTA. Mr. Perez transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

136.    Both Mr. Fernandes and Mr. Perez were named defendants in a lawsuit brought by the SEC in the United States District Court for the District of Massachusetts for their roles in orchestrating a Ponzi scheme and defrauding individuals out of approximately fifteen million dollars ($15,000,000).

137.    On or about August 7, 2023, and after receiving no response to either of his previous emails, Dr. Hantash emailed Mr. Koziel at NTA to respond to his prior question. The same day Dr. Hantash also emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie to respond to his prior notice of breach of contract. Indeed, in Dr. Hantash's email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie, he told the receiving parties that he was now aware that NTA is not a bank, foreign bank, or trust bank in the United States, Sweden, or Switzerland.

138.    Criminal Act No. 58: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 7, 2023, and following multiple requests for wire instructions and additional details, Mr. Byrd spoke with Dr. Hantash on the phone regarding his concerns. Mr. Byrd admitted NTA was not a U.S. licensed bank. Now, Mr. Byrd claimed NTA was a foreign bank licensed in Switzerland and Sweden. Mr. Byrd was unable to provide any proof of a foreign banking license in either country. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

139.    Dr. Hantash followed up with additional emails to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie on August 8 and August 9, 2023. In these emails, Dr. Hantash explained that he had received multiple liquidation notices pertaining to his wife's brokerage account., the same account from which Hantash borrowed funds to make the original $4,000,000 investment into the JV Agreement. Dr. Hantash previously explained that he was borrowing the funds from the brokerage

account and that funds needed to be repaid in 90 days, thus explaining Dr. Hantash's focus on understanding what return was feasible within a 90-day turnaround time. Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie went silent.

140.   On or about August 11, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie requesting proof of funds for the second distribution due from his investment. Dr. Hantash also drew attention to his latest conversation with Mr. Byrd wherein Mr. Byrd explained he was not part of Velanos. Mr. Byrd has a Velanos email address and consistently held himself out as the individual with control over Velanos' operations.

141.   Criminal Act No. 59: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 15, 2023, Dr. Hantash emailed Mr. Fenster and Mr. Gillespie as a demand to share Deal Exchange's D&O policy and carrier information for claims against Velanos and/or Soteria. Mr. Fenster responded via email and told Dr. Hantash that he had no communication or information regarding Dr. Hantash's SBLC investment since April 2023. This is inconsequential. Mr. Fenster's actions from January through April 2023 solidified his and Deal Exchange's role in the SBLC Syndicate for which he is liable. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

142.   On or about August 17, 2023, having received no response to his prior emails, Dr. Hantash sent a follow up email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding Velanos' breach of contract in relation to the JV Agreement.

143.   Criminal Act No. 60: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 23, 2023, Mr. Byrd represented to Dr. Hantash via text message that he had an update regarding his investment. Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth encouraging Mr.

Byrd to dictate his update in an email. Mr. Byrd did not respond. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

144.    On or about August 29, 2023, Dr. Hantash emailed Mr. Gibbins, the supposed previously successful investor to whom Mr. Byrd and Mr. Gillespie referred Dr. Hantash, to inquire about his experience and set up a phone call. Mr. Gibbins did not respond.

145.    On or about August 28 and 29, 2023, Dr. Hantash emailed a notice of default under the JV Agreement to Lucia Harris (a/k/a Lucia Alves) and James Hutchinson, two directors of Velanos.

146.    Criminal Act No. 61: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about August 29, 2023, Ms. Harris responded to Dr. Hantash's email stating that she would review his complaint and would follow up with Dr. Hantash once done. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

147.    Criminal Act No. 62: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about August 29, 2023, Mr. Hutchinson responded to Dr. Hantash's email stating that he was in receipt of Dr. Hantash's complaint and that he would look into the matter. Mr. Hutchinson never responded in substance. Mr. Hutchinson transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

148.    Criminal Act No. 63: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about September 1, 2023, Dr. Hantash sent follow up emails to Ms. Harris and Mr. Hutchinson. Ms. Harris responded on September 3, 2023, that Velanos does not have D&O insurance that she

"cannot speak to the US Velanos Corporation." Ms. Harris also stated that she was not aware of any account Dr. Hantash may or may not have had with NTA. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

149.    Criminal Act No. 64: Violations of 18 U.S.C. § 1343 (Wire Fraud). In a separate email on September 3, 2023, Ms. Harris told Dr. Hantash that she would provide him with information for her lawyer separate from Velanos should a lawsuit be filed. Ms. Harris also represented that she would reach out to NTA to request an explanation regarding Dr. Hantash's concerns. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

150.    Criminal Act No. 65: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about September 6, 2023, Ms. Harris emailed Dr. Hantash to say that she had not been a director at Velanos since January 27, 2023 – prior to the execution of the JV Agreement. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

151.    On or about October 3, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding their failure to respond to his notice of default and their failure to cure their material breach of the JV Agreement.

## VII. Hantash Learns He is the Latest Victim to the SBLC Syndicate's Repeated Fraudulent Schemes.

152.    As days went by with no clear answers and no money returned, Dr. Hantash's suspicions grew that he had fallen victim to a multi-million-dollar fraudulent scheme. Accordingly, Mr. Hantash took it upon himself to research the individuals with whom he was in contact.

153.   Dr. Hantash learned that Mr. Byrd was involved with an entity called FCC Capital Ventures in Dallas, Texas, albeit under the alias "Wilbur Byrd." Dr. Hantash further learned that Mr. Byrd was involved in a lawsuit related to FCC Capital Ventures in which it is alleged Mr. Byrd induced others into an investment fraud scheme. The relevant case is captioned as: Cause No. DC-21-05384 – *Aexonis Holdings, Inc. v. Wilbur Byrd, et al.* in the 101st District Court, Dallas County, Texas ("Aexonis Lawsuit").

154.   Dr. Hantash contacted the plaintiff's attorney in the newly discovered lawsuit. The plaintiff's attorney indicated that at least five other individuals/entities had contacted him with concerns about investment fraud related to Mr. Byrd and entities under his control – each for tens of millions of dollars.

155.   Dr. Hantash also learned that many individuals with whom he was in contact regarding his investment had provided pseudonyms or slightly misspelled names. For example, James William Byrd went by the name Wilbur Byrd based on the Aexonis Lawsuit. Velanos' Canadian bank officer was listed as "Jasotha Ulganathan"; however, further researched revealed the correct spelling was "Jasotha Ulaganathan." Hantash also learned that the reference investor with whom he spoke, and to whom Defendants consistently referred to as "Martin Gibbons," was more accurately spelled "Martin Gibbins." Additionally, the head of the NTA bank was introduced as "Danyel Fernandes" originally, when his real name is "Daniel Fernandes."

156.   Dr. Hantash also learned that Mr. Byrd, Mr. Wearmouth, and NTA were all defendants in a lawsuit brought by Genie Investments NV in Florida Federal court. The relevant case is captioned as: Case No. 6:24-cv-271-ACC-LHP – *Genie Investments NV, LLC v. Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC* in the in the United States District Court for the Middle District of Florida, Jacksonville Division ("Genie Lawsuit").

157.    In the Genie lawsuit, Plaintiff Genie Investments NV, LLC ("Genie") allege Mr. Byrd and Mr. Wearmouth defrauded Genie into contributing a total of nine million dollars ($9,000,000) into an investment with Velanos. Mr. Byrd, Mr. Wearmouth, and Velanos also worked with NTA to further their scheme against Genie, even including creating a fake bank account to display Genie's alleged investment.

158.    The structure of the scheme in the Genie Lawsuit is nearly identical to the scheme the Defendants have perpetrated against Dr. Hantash here. Genie lost millions as has Dr. Hantash.

159.    Defendants have demonstrated a pattern of repeated attempts to intentionally defraud millions of dollars from multiple individuals and companies. Thus, the SBLC Syndicate extends beyond just the illegal actions against Dr. Hantash. Accordingly, Defendants unequivocally represent what can only amount to a coordinated criminal organization.

## CAUSES OF ACTION

### COUNT I: RICO – 18 U.S.C. § 1962(c)

160.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

161.    This Count is against all Defendants.

162.    The SBLC Syndicate is an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the SBLC Syndicate.

163.    Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Dr. Hantash. The Defendants fraudulently induced Dr. Hantash into transferring Four Million Dollars ($4,000,000) to the SBLC Syndicate. The Defendants misrepresented the status and liquidity of Dr. Hantash's property to deprive him of the same and profit therefrom.

164.    Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed at least 65 related criminal acts as set forth above, which constitute racketeering activity pursuant to 18 U.S.C. § 1343 (relating to wire fraud).

165.    The 65 related criminal acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

166.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. 1962(c).

167.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

168.    Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

## COUNT II: RICO – 18 U.S.C. § 1962(d)

169.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

170.    This Count is against all Defendants.

171.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct and participate in the conduct of the affairs of the

SBLC Syndicate though a pattern of racketeering activity. The Defendants also conspired to conceal the conduct of the affairs of the SBLC Syndicate through a pattern of racketeering activity.

172.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), itself a violation of 18 U.S.C. § 1962(d).

173.    As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1961 *et seq.*, Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

174.    Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

### COUNT III: COMMON LAW FRAUD

175.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

176.    This Count is against all Defendants.

177.    As set forth above, Defendants, as individuals and acting by and through their respective principles, employes and agents, made material misrepresentations to Dr. Hantash as it concerned his investment of Four Million Dollars ($4,000,000) into the SBLC Syndicate's scheme including the validity of the investment, the terms of the investment as represented in the JV Agreement and elsewhere, the length of the investment, the profit-split of the investment, the return

on investment, and more. Defendants represented that they offered a safe and lucrative investment for Dr. Hantash.

178.    These material representations were false.

179.    At the time these representations were made, Defendants knew the representations were false and/or made these representations recklessly, as a positive assertion, and without knowledge of the truth. In doing so, Defendants intended that Dr. Hantash rely on these representations and act on them.

180.    Dr. Hantash reasonably relied on these representations in investing his Four Million Dollars ($4,000,000) in the SBLC Syndicate's investment scheme.

181.    Dr. Hantash was damaged by his reliance on Defendants' misrepresentations. Dr. Hantash was deprived of Four Million Dollars ($4,000,000) of his property without any possibility of return or profit because the SBLC Syndicate's investment scheme was fraudulent.

182.    In addition to the foregoing, each Defendant is vicariously liable for the fraudulent acts because they directly benefited from the fraudulent conduct identified herein and had knowledge of the fraud.

183.    Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; and (c) all such further relief as this Court deems just and proper.

### COUNT III: UNJUST ENRICHMENT

184.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

185.    This Count is against all Defendants.

186.     As set forth above, Defendants set out a fraudulent investment scheme to induce Dr. Hantash to turn over Four Million Dollars ($4,000,000) to Defendants. Accordingly, Dr. Hantash, at his own expense, provided Defendants $4,000,000 as an investment.

187.     Defendants were enriched by virtue of Dr. Hantash providing Defendants with the Four Million Dollars ($4,000,000).

188.     As set forth above, Defendants obtained the benefit by fraud.

189.     For the reasons set out above, Defendants have been unjustly enriched, and it would by unjust to permit Defendants to retain the $4,000,000 that Dr. Hantash provided.

190.     As a result of Defendants acts and omissions directly resulting in Defendants' retension of the benefit and unjust enrichment, Dr. Hantash has suffered actual and significant injury. Defendants will be unjustly enriched if allowed to retain the benefit; therefore, Dr. Hantash is entitled to full restitution of the Four Million Dollars ($4,000,000).

191.     Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) attorneys' fees and costs pursuant TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*; and (c) all such further relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recover appropriate relief or judgment against Defendants for:

(i)     actual damages;

(ii)     consequential damages;

(iii)    exemplary damages, including but not limited to, treble damages pursuant to 18

U.S.C. § 1964(c);

(iv)    pre-judgment and post-judgment interest at the maximum rate allowed by law;

(v)    reasonable and necessary attorneys' fees;

(vi)    costs of court; and

(vii)    such other relief, general and special, to which Plaintiff is entitled at law and/or in

equity, and/or which the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues that are so triable.

Dated: September 20, 2024

Respectfully submitted,

**CHAMPION LLP**

*/s/ Austin Champion*
Austin Champion
Texas Bar No. 24065030
Austin.Champion@championllp.com

Eugene M. Massad, III
Texas Bar No. 24126247
Eugene.Massad@championllp.com
----
2200 Ross Avenue
Suite 4500W
Dallas, Texas 75201
214-225-8880 | Main
214-238-8881 | Fax

and

**STOKLEY PLLC**

W. Craig Stokley
State Bar No. 24051392
cstokley@stokleypllc.com
----
8150 N. Central Expressway
Suite 550
Dallas, Texas 75206
Telephone: (214) 295-6414

**COUNSEL FOR PLAINTIFF
BASIL M. HANTASH**





| | 9/26/2024 | 21 | 2024-09-26-001 | SUMMONS Returned Executed as to Walden Festini: served on 9/20/2024. (agr) (Entered: 09/26/2024) |
| | 9/27/2024 | 22 | 2024-09-27-001 | SUMMONS Returned Executed as to Kevin Robert Champion: served on 9/20/2024. (agr) (Entered: 09/27/2024) |
| | 10/16/2024 | 23 | 2024-10-16-001 | NOTICE of Dismissal Voluntary Dismissal of Kevin Robert Champion filed by Basil M. Hantash (Champion, Austin) (Entered: 10/16/2024) |
| | 10/25/2024 | 24 | 2024-10-25-001 | SUMMONS Returned Executed as to Fernandez Rico Filer. served on 10/11/2024. (jmr) (Entered: 10/25/2024) |
| | 10/31/2024 | 25 | 2024-10-31-001 | Summons Issued as to Bee Exchange LLC. (tel) (Entered: 10/31/2024) |
| | 11/6/2024 | 26 | 2024-11-06-001 | SUMMONS Returned Executed as to Sonica Group LLC. served on 11/1/2024. (agr) (Entered: 11/06/2024) |





















| | | | | |
|---|---|---|---|---|
| 41 | 4/30/2025 | 148 | 2025-04-31 001 | ***VACATED PER 71 ORDER*** *Clerk's ENTRY OF DEFAULT as to Solera Group LLC, Lynn Phontheisen 7/30/2025 (zkp) (Entered: 04/31/2025) |
| 42 | 4/30/2025 | | 2025-04-31 001 | ELECTRONIC ORDER granting 34 MOTION to Leave to File Motion for Default Judgment filed by Bassi M Hantash. (Ordered by Senior Judge Sidney A F Fizzette on 4/31/2025.) (Senior Judge Sidney A F Fizzette) (Entered: 04/31/2025) |
| 43 | 4/30/2025 | 149 | 2025-04-31 001 | Proposal for Contents of scheduling and discovery Joint Joint Report of Scheduling Conference and Report for Contents of Scheduling Order by Bassi M Hantash. (Chambless, Austin) (Entered: 04/30/2025). |
| 44 | 4/30/2025 | 150 | 2025-04-30 001 | MOTION for Default Judgment against Braden Fender, Deus Exchange LLC, Joshua Matthew Whitmoarsh, Linda Byrd, and Solera Group LLC, jointly and severally filed by Bassi M Hantash with Brief/Memorandum in Support. (Chambless, Austin) Modified docket text on 4/2/2025 (ak). (Entered: 04/30/2025). |
| 45 | 4/30/2025 | 151 | 2025-04-28 001 | Appendix in Support filed by Bassi M Hantash re 34 MOTION for Default Judgment against Bassi M Hantash (Chambless, Austin). (Entered: 04/30/2025). |
| 46 | 5/3/2025 | 152 | 2025-03-03 001 | MOTION to Vacate 61 Clerk's Entry of Default filed by Solera Group LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D (Proposed Answer), # 5 Exhibit E (Proposed Order) Attorney Matthew D Ander not added to party, Solera Group LLC)(by JM) (Anderson, Matthew) (Entered: 05/03/2025). |





| 77 | 7/30/2025 | 19.26.14 | 181 | 2025-07-30 001 | ORDER: Proposed Scheduling Order due by 8/7/2025. (Ordered by Senior Judge Sidney A F Fitzwater on 7/30/2025) (avm) (Entered 07/30/2025) | Order for Scheduling Order Proposa |
| 78 | 7/14/2025 | 16.41.41 | 180 | 2025-07-14 001 | ANSWER to 1 Complaint ... filed by Solaria Group LLC. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov or by clicking here Attorney Information-Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Anderson, Matthew) (Entered: 07/14/2025) | Answer to Complaint |

# EXHIBIT F

Probate Filings in Collin County re: Estate of James W. Byrd.

Electronically Filed 12/19/2024 4:24 PM
Stacey Kemp, County Clerk
Collin County, Texas
By: Lana Thomason, Deputy
Envelope: 95525183

PB1-1942-2024

No. _____

| | | |
|---|---|---|
| **IN THE ESTATE OF** | § | **IN THE PROBATE COURT** |
| | § | |
| **JAMES WILLIAM BYRD** | § | **NO. 1 OF** |
| | § | |
| **DECEASED** | § | **COLLIN COUNTY, TEXAS** |

## APPLICATION FOR TEMPORARY ADMINISTRATION, APPLICATION FOR INDEPENDENT ADMINISTRATION AND LETTERS OF ADMINISTRATION PURSUANT TO SECTION 401.003 OF THE TEXAS ESTATES CODE AND APPLICATION TO DETERMINE HEIRSHIP

**TO THE HONORABLE JUDGE OF SAID COURT:**

**Application for Letters of Temporary Administration:**

Linda K. Byrd ("Applicant"), furnish the following information to the Court for the appointment of Applicant as Temporary Administrator in the Estate of James William Byrd, ("Decedent"). And for issuance of Letters of Temporary Administration:

1.    Applicant Linda K. Byrd's state of residence is Texas, being domiciled in and residing at 8600 FM 2609 Nacogdoches, Texas 75965. Linda K. Byrd is the mother of the Decedent, is entitled to Letters of Temporary Administration.    The last three digits of the social security number of Linda K.

Byrd are 265.  The last three digits of the driver's license number of Linda are 175.

2.      Decedent died intestate on November 25, 2024, at Prosper, Collin County, Texas, at the age of 44 years.  Decedent's domicile at the time of his death was Collin County, Texas.  The last three digits of the social security number of Decedent are 779.  The last three digits of the driver's license number of Decedent are 702.

3.      This Court has jurisdiction and venue is proper because Decedent was domiciled in Texas and had a fixed place of residence in this County on the date of his death.

4.      The interest of Decedent's estate requires immediate appointment of a personal representative because it is necessary to protect and preserve assets of the estate described generally as real estate, accounts, cash, personal effects and household goods of a probable value in excess of $100,000.

5.      The Temporary Administrator of this Estate should be given the following powers:

(a)    collect all assets, proceeds and debts belonging to or owed by the estate;
(b)    open and maintain a bank account or accounts for the estate;
(c)    secure and protect all real property in which the estate has an interest;
(d)    Pay outstanding debts on behalf of the estate as necessary;
(e)    To be able to manage all business affairs;
(f)    To be able to gain access to all financial accounts, both debts and assets.
(g)    To gain access to any and all safe-deposit boxes in the name of the Decedent in order to inventory the contents of said safe-deposit boxes

and obtain copies of any and all documents contained therein, but not to remove the contents without further court approval. The Temporary Administrator is further authorized to direct any bank or other financial institution to access such safe deposit box by any means necessary, including by drilling to gain access to the box if a key or keys is not available;

(h)   All other powers necessary to perform the duties of a Temporary Administrator;

(i)   Such other powers as necessary to preserve and protect the estate; and

(j)   initiate any and all necessary actions to collect and retrieve decedents cell phones, laptops, computers or other digital devices

6.   The name, age, marital status, and address of each of Decedent's heirs, the relationship of each heir to Decedent and the true interest of the Applicant and of each of the heirs in the Estate of Decedent are as follows:

a.   Name:  Aria Wilde Byrd
Age:  10
Marital Status:  single
Address:  Las Vegas, Nevada
Relationship:  Child

7. Decedent was never married.

8. Decedent was not predeceased by any child.

9. Decedent did not leave a valid Will.

## Application for Letters of Administration and to Determine Heirship:

Linda k. Byrd ("Applicant") furnishes the following information to the Court concerning the Estate of James William Byrd ("Decedent") for the appointment of an Administrator and issuance of Letters of Administration and to Determine Heirship:

10.     Applicant Linda K. Byrd, an individual interested in this Estate, being domiciled in and residing at 8600 FM 2609 Nacogdoches, Texas 75965.  Linda K. Byrd is entitled to Letters of Administration, is not disqualified by law and is the mother of the Decedent.  The last three digits of the social security number of Linda K. Byrd are 265.  The last three digits of the driver's license number of Linda are 175.

11.     Decedent died intestate on November 25, 2024, at Collin County, Texas, at the age of 44 years.  Decedent's domicile at the time of his death was Prosper, Collin County, Texas.  The last three digits of the social security number of Decedent are 779.  The last three digits of the driver's license number of Decedent are 702.

12.     This Court has jurisdiction and venue is proper because Decedent was domiciled in Texas and had a fixed place of residence in this County on the date of his death.

13.     Decedent owned property described generally as real estate, cash, personal effects and household goods of a probable value in excess of $100,000.

14.     The name, age, marital status, and address of each of Decedent's heirs, the relationship of each heir to Decedent and the true interest of the Applicant and of each of the heirs in the Estate of Decedent are as follows:

a.     Name:  Aria Wilde Byrd
       Age:  10

Marital Status:  single
Address:  Las Vegas, Nevada
Relationship:  Child
Share of Real and Personal Property:       100%

15.     A necessity exists for the administration of the estate, specifically to collect assets belonging to the estate, pay outstanding debts and distribute to the heirs.

16.     Decedent was not predeceased by any child.

17.     Decedent was never married.

18.     All children born to or adopted by Decedent have been listed.  Each marriage of Decedent has been listed.

19.     To the best of my knowledge, Decedent died intestate.

20.     This Application does not omit any information required by the Texas Estates Code, Section 202.004, 202.005, 202.007 and 202.008, except as follows: None.

21.     There is a necessity for administration of the Estate

22.     An independent administration of the Decedent's estate pursuant to Section 401.003 of the Texas Estates Code is advisable and in the best interests of the Decedent's estate and of the heirs and distributees of the Decedent's estate.

23.     This Application contains all of the material facts and circumstances within the knowledge and information of the Applicants that might reasonably tend

to show the time or place of death or the names or residences of all heirs, if the time or place of death or the names or residences of all the heirs are not definitely known to the Applicant, except as follows:  None.

24.    Pursuant to Section 401.005 of the Texas Estates Code, Applicant request that the requirement for bond be waived.

**WHEREFORE**, Applicant requests to the Court to make an immediate appointment of Applicant as Temporary Administrator of Decedent's Estate to serve for a period of time, not to exceed one hundred either (180) days, unless the appointment is made permanent by order of this Court; that citation be issued as required by law to all persons interested in this Estate; that applicant be appointed an Administrator; that Letters of Administration be issued to Linda K. Byrd; that appraisers not be appointed ; that an attorney ad litem be appointed to represent the interests of unknown heirs; that upon hearing hereof, this Court determine who are the heirs and only heirs of Decedent and their respective shares and interests in this Estate; that a necessity exists for an administration for Decedent's Estate; and that all other Orders be entered as the Court may deem proper.

Respectfully submitted,

YATES LAW GROUP, PLLC

/s/ *Jeffrey A. Yates*
Jeffrey A. Yates
State Bar No.: 24004999
290 S. Preston Rd., Ste. 300
Prosper, Texas 75078
Telephone: (214) 281-8000
Facsimile: (214) 281-8002
E-mail: Jeff@YatesLG.com

### Declaration Pursuant to §132.001 Tex. Civ. Prac. & Rem. Code

"My name is Linda K. Byrd.  My date of birth is _8/21/1957_ and

my address is 8600 FM 2609, Nacogdoches, Texas 75965, United States of

America.  I have read the foregoing Application for Independent Administration

and Letters of Administration and to Determine Heirship and declare under penalty

of perjury that the facts stated in those paragraphs are within my knowledge and

true and correct.

Executed in _Collin_ County, Texas, on December _17_, 2024.


_Linda K Byrd_
Linda K. Byrd, Applicant

No. PB1-1942-2024

| | | |
|---|---|---|
| **IN THE ESTATE OF** | § | **IN THE PROBATE COURT** |
| | § | |
| **JAMES WILLIAM BYRD** | § | **NO. 1 OF** |
| | § | |
| **DECEASED** | § | **COLLIN  COUNTY, TEXAS** |

## ORDER GRANTING LETTERS OF INDEPENDENT ADMINISTRATION AND JUDGMENT DECLARING HEIRSHP

On this day came on to be heard the Application for Letters of Independent Administration and Application to Determine Heirship filed herein by Linda K. Byrd, on December 19, 2024, in the Estate of James William Byrd, Deceased.

The Court, after having heard and considered the evidence, and having reviewed the documents filed herein, finds that notice and citation have been given in the manner and for the length of time required by law; that James William Byrd ("Decedent"), is dead and four (4) years have not elapsed since the date of death; that this Court has jurisdiction and venue over the Decedent's estate; that the Decedent died intestate; that a necessity exists for administration of this estate; that no interested person has applied for the appointment of appraisers and none are deemed necessary; that appointment of an Independent Administrator of this estate and for issuance of Letters of Independent Administration should be granted; that

Linda B. Byrd, be appointed as the Independent Administrator of this estate and has not been convicted of any felony or otherwise disqualified from acting as such and is qualified to receive Letters of Independent Administration.

Aria Wilde Byrd is the heir to the Decedent's Estate, and Decedent's living heirs whose names and/or whereabouts are unknown are Defendants, and it appears to the Court, and the Court so finds that all parties interested in the Estate of Decedent have been duly and legally served with citation as required by law; that the Court appointed an Attorney Ad Litem to appear and answer and to represent Defendants and such Attorney Ad Litem did so appear and filed an answer for Defendants; that this Court has jurisdiction of the subject matter and all persons and parties; that the evidence presented and admitted fully and satisfactorily proves each and every issue presented to the Court; that Decedent died intestate and that the heirship of Decedent has been fully and satisfactorily proved and the interest and shares of each of the heirs therein.

**IT IS THEREFORE ORDERED AND DECREED** by this Court that the names and places of residence of the heirs of Decedent and their respective shares and interests in the real and personal property of Decedent are as follows:

a.  Name:              Aria Wilde Byrd, a minor
    Relationship:      Child
    Share of Real Property: 100%
    Share of Personal Property: 100%

**IT IS ORDERED and DECREED** that J Kevin Young, the Attorney Ad Litem appointed to represent the interests of the Defendants, is allowed a fee of $ ~600.00~ and is discharged.

**IT IS FURTHER ORDERED AND DECREED** that Linda K. Byrd be, and is hereby appointed Independent Administrator of the Estate of James William Byrd, Deceased; that Letters of Independent Administration be, and the same are hereby granted to Linda K. Byrd; that upon the taking and filing of the Oath as required by law, the Clerk shall issue Letters of Independent Administration to Linda K. Byrd.

SIGNED on the ~9~ day of ___June~, 2025.

_____
**JUDGE PRESIDING**

6/23/2025 4:42:24 PM

**EXHIBIT G**

**Docket Sheet –** *Genie Investments v. Wearmouth*, **M.D. Fla. (Dec 12, 2023)**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**GENIE INVESTMENTS NV, LLC,**

**Plaintiff,**

v.                                               Civil Action No.

**JOSHUA WEARMOUTH, JAMES**        **[Jury Trial Demanded]**
**WILLIAM BYRD, and NORDIC**
**TRUST ALLIANCE KB, LLC,**

**Defendants.**

## COMPLAINT

Plaintiff Genie Investments NV (Genie), by and through its attorneys, Spiegel & Utrera, P.A., files this Complaint against Defendants Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC (Nordic Trust) and alleges, on knowledge at to its own actions, and otherwise upon information and belief, that:

## SUMMARY

1.    In 2022 and 2023, Respondents Joshua Wearmouth and James Byrd, directly and through Velanos Principal Capital (Velanos), an entity that Wearmouth controlled, defrauded Plaintiff Genie Investments NV (Genie) out of

$9.0 million using a type of scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.    Wearmouth and Byrd represented to Genie verbally and in writing that Wearmouth, through Velanos, could procure one or more standby letters of credit (SBLCs), which Wearmouth would then sell at a significant profit in pre-arranged trades. Wearmouth and Byrd told Genie that Wearmouth would use this trading profit to procure one or more additional SBLCs, which Wearmouth would again sell in pre-arranged trades, again at a significant profit.

3.    In October 2022, Wearmouth and Byrd told Genie that, if Genie contributed $3.0 million to a joint venture with Velanos, Wearmouth would use Genie's capital to generate profits of many times the amount of the capital contribution within 60 days. Wearmouth and Byrd subsequently told Genie that it could increase its profit by making additional capital contributions.

4.    Based on these representations, Genie invested a total of $9 million in a joint venture with Velanos. Wearmouth and Byrd represented that Genie would receive a total of $75.0 million – comprising a return of its $9 million in capital contributions plus $66 million in profit – by the end of 2022.

5.    Wearmouth and Byrd represented to Genie that the SBLC trading presented no risk of loss to Genie's capital contribution.

6.     Wearmouth and Velanos never obtained SBLCs with Genie's capital, never earned any of the promised returns in a trading program, never paid any profits to Genie, and never intended to do so. To date, Velanos has returned only $500,000 of the $9 million invested by Genie.

7.     To keep the scheme going and to forestall legal action against them and Velanos, Wearmouth, Byrd, and Defendant Nordic Trust Alliance KB (Nordic Trust) made lulling statements to Genie, representing falsely that the trading program was successful and/or that payments to Genie were imminent or had been made.

## PARTIES

8.     Plaintiff Genie Investments NV (Genie) is a closely held corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Reno, Nevada. Since 2021, Genie has been in the business of providing financing to small and medium-sized businesses through lines of credit.

9.     Defendant Joshua Wearmouth is an individual who, on information and belief, resides in Newport Beach, California, and is a citizen of the state of California.

10.     Defendant James William Byrd is an individual who, on information and belief, resides in Dallas, Texas, and is a citizen of the state of Texas.

11.     Defendant Nordic Trust Alliance KB is a limited-liability company

that is organized under the laws of the state of Florida and that has its principal

place of business in Miami, Florida.

## JURISDICTION AND VENUE

12.     This Court has original subject-matter jurisdiction of this action

pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it concerns

violations of the Securities Act of 1933 ("the '33 Act"), the Securities Exchange

Act of 1934 ("the '34 Act"), and Exchange Act Rule 10b-5.

13.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. §

1332 because the amount in controversy exceeds $75,000, exclusive of interest and

costs, and there is complete diversity of citizenship between Plaintiff and the

Defendants.

14.     This Court has jurisdiction over Plaintiff's related state-law claims

pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

15.     Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce or of the mail in connection with the

transactions, acts, practices, and courses of business alleged in this complaint.

16.     Venue in this district is proper pursuant to Section 22(a) of the '33

Act, 15 U.S.C. § 77v(a), and Section 27(a) of the '34 Act, 15 U.S.C. § 78aa.

Among other things, certain of the acts, practices, and courses of business

constituting the violations of the federal securities laws alleged herein occurred

within this district, including that Defendants directed misrepresentations and

deceptive conduct toward Genie representatives residing within this district.

17. This Court has personal jurisdiction over Defendant Wearmouth

because Wearmouth purposefully directed actions at this forum in furtherance of

the SBLC scheme.

18. This Court has personal jurisdiction over Defendant Byrd because

Byrd purposefully directed actions at this forum with respect to the SBLC Scheme.

19. This Court has personal jurisdiction over Defendant Nordic Trust

Alliance because Nordic Trust Alliance maintains a place of business within this

district and purposefully directed its conduct at this forum with respect to the

SBLC Scheme.

## **DEFENDANTS' PRIME BANK SCHEME**

20. In late 2023, Genie was seeking capital to lend to customers. Byrd,

who had previously acted as a finder for Genie, introduced Genie to Wearmouth,

who ran a business called Velanos Principal Capital (Velanos).

21. Wearmouth and Byrd represented to Genie both verbally and in

writing that Wearmouth, through Velanos, regularly used financial instruments

known as standby letters of credit (SBLCs) to raise capital.

5

22.     Wearmouth and Byrd told Genie that Wearmouth had specialized experience, knowledge, and connections through allowed him to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

23.     Wearmouth proposed a joint venture between Genie and Velanos whereby Velanos, using capital supplied by Genie, would initiate a series of SBLC trades that would generate massive profits for Genie and Velanos (the SBLC scheme).

24.     Byrd regularly acted as Wearmouth's go-between in communications with Genie concerning the SBLC scheme.

25.     Wearmouth and Byrd told Genie that Velanos would return Genie's principal and distribute profits to Genie of up to 800% of the principal investment within 60 days.

26.     Wearmouth and Byrd assured Genie that the SBLC scheme posed no risk of loss to Genie's capital.

27.     Wearmouth also introduced Genie to a lawyer who, according to Byrd, had experience with financing arrangements similar to the SBLC scheme. Genie retained the lawyer to advise them about the proposed joint venture.

28.    On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) concerning the SLBC scheme. Wearmouth executed the JVA on behalf of Velanos.

29.    The JVA required Genie to contribute $3.0 million in capital to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers.

30.    The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days.

31.    Shortly after Genie and Velanos executed the JVA, Wearmouth and Byrd told Genie that it could increase its capital contribution by an additional $3 million and, in exchange, would receive a guaranteed profit distribution of $50 million. Genie agreed and, on November 21, 2022, Genie and Velanos executed an amendment to the JVA (First JVA Amendment) providing that Genie would increase its capital contribution to $6.0 million and that, in return, Velanos would increase Genie's profit to $50 million dollars.

32.    The First JVA Amendment did not change any terms of the JVA besides the amounts of (a) Genie's capital contribution and (b) its profit participation.

7

33.    Shortly after the First JVA Amendment, Wearmouth and Byrd again offered to increase Genie's profit from the JVA, to a total of $66 million, in exchange for an additional $3 million capital contribution.

34.    Genie agreed and provided Velanos an additional $3 million, bringing its total capital contribution to the joint venture to $9.0 million.

35.    Although the parties did not memorialize Genie's third $3 million payment with a formal amendment to the JVA, correspondence from both Wearmouth and Byrd reflected the updated terms of the agreement – namely, that Genie would receive a total of $66 million in profits, in addition to the return of its $9 million in capital, by mid-January 2023.

36.    Velanos and Wearmouth never paid Genie any of the profits promised in the JVA and has returned barely 5% of Genie's capital contributions.

37.    Since January 2023, Wearmouth and Byrd have repeatedly and falsely represented that Wearmouth transferred or initiated transfers of multimillion-dollar payments to Genie.

38.    On or about January 24, 2023, Wearmouth provided Genie with a screenshot of an email that Wearmouth supposedly received from a person identified only as "Simon," who, according to Wearmouth, was a banker with HSBC Bank. The email stated that Velanos had more than 349 million Euros on account with HSBC Bank in London and provided an account number. Wearmouth

asserted that this amount included the profits realized from the Genie-Velanos joint venture's trading activity.

39.    Approximately three days later, Velanos provided Genie with photographs and a screenshot that appeared to show a $10.0 million wire transfer from a ScotiaBank account to Genie's account at Chase Bank.

40.    In March 2023, Wearmouth falsely told Genie in writing that the $10.0 million wire transfer he supposedly initiated on January 27, 2023, was being held up by Wells Fargo Bank, which he described as the "corresponding bank" for the wire transfer.

41.    In the same letter, Wearmouth falsely claimed that profits from trading conducted using Genie's $9.0 million in capital were "being held at HSBC, UK under a sub account…" and that Velanos would need to open a "master" account with HSBC to access the trading profits in the subaccount.

42.    In early June 2023, Wearmouth and Byrd proposed that Genie agree to an amendment of the JVA. The proposal, as memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment), was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3)

deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

43.     The parties executed the Second JVA Amendment on June 3, 2023. Shortly afterward, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, according to the Portal, Velanos transferred $9.5 million into Genie's Nordic Trust Account. Genie promptly instructed Nordic to wire the $9.5 million to its checking account at Chase Bank. That transfer never happened, however, and the Portal showed that Nordic Trust canceled the request as of June 29, 2023.

44.     On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million from its Nordic Trust account to its Chase account. Although the Portal showed that this transaction was executed – the Portal thereafter reflected a remaining balance of $100,000 in Genie's account – no money ever transferred to Genie's Chase account from Nordic Trust.

45.     Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire transfers. The only responses it received were non-substantive. When Genie asked to speak with an individual so that it could arrange to visit Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Genie lost its ability to view account-related information through the Portal.

46.    On information and belief, Nordic Trust is not a legitimate bank, never held any funds in Genie's name, and knowingly participated in Wearmouth's and Byrd's efforts to forestall legal action against Wearmouth, Byrd, and others by convincing Genie that it would imminently receive a portion of the promised SBLC scheme proceeds.

47.    From late 2022 to mid-2023, Genie entered various agreements to provide lines of credit to customers and did so in reliance on Defendants' false promises and misrepresentations that Genie would soon receive some or all of the promised proceeds from the SBLC scheme.

48.    Genie's reliance on these false statements and misrepresentations was reasonable given the lengths Defendants went to give their false statements and misrepresentations an air of legitimacy. In addition, Genie's attorney at the time did not advise Genie that there was any reason to question the validity of either the SBLC scheme or any of the Defendants' subsequent statements about Velanos' ability and intention to distribute profits to Genie and return its capital contributions.

49.    Genie relied on Defendants' false statements and misrepresentations to its substantial detriment, in that it was ultimately unable to provide the financing it had promised to numerous customers, which in turn led to an avalanche of terminations, refund requests, demand letters, disparaging public statements, and

legal actions against Genie. In addition, Defendants' false statements and

misrepresentations, and Genie's detrimental reliance on them, have made it

impossible for Genie to enter into new lending arrangements with customers.

50.    Other than a $500,000 payment it received in or about May 2023,

Genie has never received any return of its capital contributions. It has never

received any of the promised profits from the joint venture.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and
### Exchange Act Rules 10b-5(a) and (c) – All Defendants

51.    Genie realleges and incorporates by reference its allegations in

Paragraphs 1 through 50.

52.    During 2022 and 2023, Defendants Wearmouth, Byrd, and Nordic

Trust, in the purchase or sale of the securities described herein, by the use of means

and instruments of transportation and communication in interstate commerce and

by use of the mail, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud,

    b.    made untrue statements of material facts and/or omitted to state

material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and

12

    c.  engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

53. Defendants Wearmouth, Byrd, and Nordic Trust made these misrepresentations and omissions of material fact with scienter – that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth by inducing Genie's investment in the SBLC scheme while having no intention of using Genie's funds to carry out any legitimate trading of securities or other financial instruments.

54. Genie relied on the misrepresentations and omissions of Wearmouth, Byrd, and Nordic Trust, both in contributing capital to the putative Genie-Velanos joint venture and in delaying legal action against the Defendants and others.

55. Defendants carried out their fraudulent and deceptive acts using means or instrumentalities of interstate commerce. Defendants used interstate electronic messages and telephone communication to propose the SBLC scheme, to induce Genie's participation in the joint venture, and to communicate with Genie about why Genie did not receive either the promised profits or a return of its capital contributions.

56.　As a direct and proximate result of the Defendants' conduct described herein, Genie has suffered economic loss in that it has been deprived of the benefit of its bargain and has suffered lost profits and consequential damages.

57.　Through the Defendants' conduct described herein, Wearmouth, Byrd, and Nordic Trust willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

### California Corp. Code § 25401 – Against Wearmouth and Byrd

58.　Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

59.　During 2022 and 2023, Defendants Wearmouth and Byrd, in the offer and sale of the securities described herein in and/or from the State of California, made untrue statements and/or misrepresentations of material fact to Genie. The false statements and misrepresentations included, without limitation:

　　a.　Wearmouth and Byrd falsely stated that SBLCs were tradable instruments and that the SBLC scheme was a legitimate investment program that presented no risk of loss to Genie's capital,

　　b.　Wearmouth and Byrd represented that Genie's capital contributions would be returned after the contributions were used to

14

purchase and trade SBLCs, when in fact, Defendants never returned Genie's

investment principal and, on information and belief, never used Genie's

capital contributions to purchase and trade SBLCs, and

      c.    Wearmouth and Byrd represented that the SBLC scheme would

generate significant profits and that Genie would receive a guaranteed profit

of $66.0 million in addition to the return of its capital contributions.

60.    The misstatements and omissions referred to herein concerned

"material facts" within the meaning of the California Corporations Code section

25401.

61.    As a result of the Defendants' conduct described herein, Genie has

been damaged in an amount to be determined at trial, but not less than $10 million.

62.    Through the conduct described herein, Defendants Wearmouth and

Byrd violated California Corporations Code section 25401.

## THIRD CLAIM FOR RELIEF

### Common-Law Fraud – Against All Defendants

63.    Genie realleges and incorporates by reference its allegations in

Paragraphs 1 through 50.

64.    As alleged above, Defendants Wearmouth, Byrd, and Nordic Trust

made false written and verbal statements and/or material omissions of material fact

to Genie, including but not limited to:

15

      a.     Wearmouth's ability to purchase SBLCs and resell them for a profit;

      b.     The legitimacy of any investment strategy involving trading SBLCs;

      c.     Wearmouth's intention to pay Genie the promised profits and to return Genie's capital contributions;

      d.     Wearmouth's knowledge and experience trading SBLCs;

      e.     Attempts by Wearmouth/Velanos to issue payments to Genie between January 2023 and the present;

      f.     Nordic Trust's legitimacy as a bank and its ability to accept deposits and process withdrawals.

65.    The statements and/or omissions were false when made and were in service of an actual fraud.

66.    Wearmouth and Byrd knew that the representations were untrue and/or that the omissions were misleading.

67.    Wearmouth and Byrd made each of the aforementioned misrepresentations and omissions with the intent that Genie would rely on them in deciding to contribute capital to the joint venture and/or to refrain from bringing legal action against Velanos, Wearmouth, Byrd, and others.

68.   Genie did, in fact, rely on the aforementioned misrepresentations and omissions when it contributed $9.0 million in capital to the joint venture and when it refrained from bringing legal action for several months after Wearmouth and Velanos failed to return those capital contributions and distribute promised profits on schedule.

69.   But for Wearmouth's and Byrd's material omissions and misrepresentations alleged above, Genie would not have contributed capital to the joint venture with Velanos and would have brought legal action against Wearmouth, Byrd, and others long ago.

70.   Genie's reliance upon Wearmouth's and Byrd's material omissions and misrepresentations of fact was reasonable.

71.   Wearmouth's and Byrd's material omissions and misrepresentations of fact have damaged Genie in an amount in excess of $10 million, with the exact amount of damages to be determined at trial.

72.   Wearmouth's and Byrd's conduct alleged herein was willful and wanton and they acted with actual malice, fraud, and/or gross negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Genie respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

- The entry of judgment in favor of the Genie on each and every cause of action;

- The award of actual, consequential, and statutory damages in an amount to be established at trial, but not less than $10 million;

- The award of punitive damages in an amount to be established at trial;

- The award of costs of the suit and attorney's fees; and

- Such other relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Genie demands a trial by jury on all issues that are so triable.

Dated: 2-6-2024

Respectfully submitted,

/s/ *Michael Faragalla*

Michael Faragalla  (Bar No. 1014235)

Spiegel & Utrera P.A

1840 Coral Way Fl 4

Miami, FL 33145-2748

Telephone: (800) 603-3900, x204

Facsimile: (800) 520-7800

Email:
attorneyfaragalla@amerilawyer.com CC:
litassistant@amerilawyer.com

Attorneys for Plaintiff Genie Investments
NV

## EXHIBIT G-1

**Complaint – *Genie Investments v. Wearmouth*, M.D. Fla. (Dec 12, 2023)**

*Description:* Court-stamped complaint against Velanos/Wearmouth liable for near-identical SBLC fraud—prior filed predicate act under RICO.

## CERTIFICATE OF SERVICE

| docketentry_entry_nu mber | docketentry_date_filed | docketentry_time_filed | pacer_sequence_number | docketentry_description | recapdocument_description | recapdocument_pag e_count |
|---|---|---|---|---|---|---|
| 1 | 2/6/2024 | 17:53:08 | 3 | COMPLAINT against James William Byrd, Nordic Trust Alliance KB, LLC, Joshua Wearmouth with Jury Demand (Filing fee $405 receipt number AFLMDC-21741187) filed by Genie Investments NV, LLC. (Attachments: # 1 Civil Cover Sheet)(Faragalla, Michael) Modified text on 2/7/2024 (BD). (Entered: 02/06/2024) | Complaint | 20 |
| 1 | 2/6/2024 | 1/53:08 | 3 | COMPLAINT against James William Byrd, Nordic Trust Alliance KB, LLC, Joshua Wearmouth with Jury Demand (Filing fee $405 receipt number AFLMDC-21741187) filed by Genie Investments NV, LLC. (Attachments: # 1 Civil Cover Sheet)(Faragalla, Michael) Modified text on 2/7/2024 (BD). (Entered: 02/06/2024) | Civil Cover Sheet | 2 |
| 2 | 2/7/2024 | | | NEW CASE ASSIGNED to Judge Anne C. Conway and Magistrate Judge Leslie Hoffman Price. New case number: 6:24-cv-00271-ACC-LHP (JG) (Entered: 02/07/2024) | Case Assigned/Reassi gned | |
| | 2/7/2024 | 12:24:10 | | | Case Assigned/Reassi gned | |
| 3 | 2/8/2024 | 10:03:48 | 13 | INITIAL CASE ORDER - Notice of Local Rule 3.02(a)(2), which requires the parties in every civil proceeding, except those described in subsection (6), to file a case management report (CMR) using the uniform form at www.flmd.uscourts.gov. The CMR must be filed (1) within forty days after any defendant appears in an action originating in this court, (2) within forty days after the docketing of an action removed or transferred to this court, or (3) within seventy days after service on the United States attorney in an action against the United States, its agencies, or employees. Parties have 14 days from the date of this order to file their disclosure statement (if not already filed) and to notify the court of a related action (not required if there are no related actions). Signed by Judge Anne C. Conway on 2/8/2024. (KLD) (Entered: 02/08/2024) | Interested Persons Order | |
| 4 | 2/9/2024 | 15:48:18 | 15 | ORDER directing compliance to Plaintiff to file an Amended Complaint within fourteen (14) days of the date of this Order that includes proper jurisdictional allegations. Signed by Judge Anne C. Conway on 2/9/2024. (KLD) (Entered: 02/09/2024) | Order directing compliance | |
| 5 | 2/14/2024 | 17:25:33 | 17 | NOTICE of Appearance by Michael S Faragalla on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalla, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Notice of appearance | 2 |
| 5 | 2/14/2024 | 17:25:33 | 17 | NOTICE of Appearance by Michael S Faragalla on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalla, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Supplement Amended Case Caption | 2 |
| 5 | 2/14/2024 | 17:25:33 | 17 | NOTICE of Appearance by Michael S Faragalla on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalla, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Civil Cover Sheet | 2 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4 | 2/14/2024 | 17:25:33 | 17 | NOTICE of Appearance by Michael S Faragalia on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalia, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Proposed Summons Nordic | 2 |
| 4 | 2/14/2024 | 17:25:33 | 18 | NOTICE of Appearance by Michael S Faragalia on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalia, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Supplement Rule 7.1 Disclosure | 2 |
| 5 | 2/14/2024 | 17:25:33 | 19 | NOTICE of Appearance by Michael S Faragalia on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalia, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Proposed Summons Joshua Wearmouth | 2 |
| 5 | 2/14/2024 | 17:25:33 | 11 | NOTICE of Appearance by Michael S Faragalia on behalf of Genie Investments NV, LLC (Attachments: # 1 Supplement Amended Case Caption, # 2 Civil Cover Sheet, # 3 Proposed Summons Nordic, # 4 Supplement Rule 7.1 Disclosure, # 5 Proposed Summons Joshua Wearmouth, # 6 Proposed Summons James William Byrd)(Faragalia, Michael) **COUNSEL NOTIFIED TO REFILE ATTACHEMENTS INDIVIDUALLY Modified on 2/15/2024 as to docket text (ARL). (Entered: 02/14/2024) | Proposed Summons James William Byrd | 2 |
| 6 | 2/23/2024 | 15:35:26 | 19 | First MOTION to Amend Case Caption by Genie Investments NV, LLC. (Faragalia, Michael) Motions referred to Magistrate Judge Leslie Hoffman Price. (Entered: 02/23/2024) | Motion to Amend / Correct / Modify / Supplement | 2 |
| 7 | 2/23/2024 | 15:39:34 | 21 | PROPOSED summons to be issued by Genie Investments NV, LLC. (Faragalia, Michael) (Entered: 02/23/2024) | Proposed summons | |
| 8 | 2/23/2024 | 15:39:36 | 23 | PROPOSED summons to be issued by Genie Investments NV, LLC. (Faragalia, Michael) (Entered: 02/23/2024) | Proposed summons | |
| 9 | 2/23/2024 | 15:39:37 | 25 | PROPOSED summons to be issued by Genie Investments NV, LLC. (Faragalia, Michael) (Entered: 02/23/2024) | Proposed summons | |
| 10 | 2/23/2024 | 15:41:20 | 27 | CORPORATE Disclosure Statement by Genie Investments NV, LLC. (Faragalia, Michael) (Entered: 02/23/2024) | Corporate Disclosure Statement | 2 |
| 11 | 2/26/2024 | 10:17:08 | 29 | ORDER denying without prejudice 6 Motion to Ammend Pleadings. Signed by Magistrate Judge Leslie Hoffman Price on 2/26/2024. (MKH) (Entered: 02/26/2024) | Order on Motion to Amend / Correct / Modify / Supplement | 2 |



| 12 | 2/26/2024 | 13:46:46 | 11 | SUMMONS issued as to James William Byrd, Nordic Trust Alliance KB, LLC, Joshua Wearmouth. (ABM) (Entered: 02/26/2024) | Summons issued | 8 |
| 13 | 5/13/2024 | 15:14:53 | 53 | ORDER DISMISSING Plaintiff's Complaint 1 without prejudice. The Clerk is directed to close this file. Signed by Judge Anne C. Conway on 5/13/2024. (KLD) (Entered: 05/13/2024) | Order Dismissing Case | 4 |
| | 5/13/2024 | 15:30:55 | | | Copyright Report | |
| | 5/13/2024 | 15:36:02 | | | Notice to Counsel of Local Rule | |
| 14 | 5/13/2024 | | | ENTERED IN ERROR. (IOS) (Entered: 05/13/2024) | Copyright Report | |
| 15 | 5/13/2024 | | | NOTICE of Local Rule 1.11(e), which provides that, unless an order states another time, a seal under Rule 1.11 expires ninety days after a case is closed and all appeals are exhausted. To prevent the content of a sealed item from appearing on the docket after the seal expires, a party or interested non-party must move for relief before the seal expires. (Signed by Deputy Clerk). (ARL) (Entered: 05/13/2024) | Notice to Counsel of Local Rule | |
| 16 | 6/26/2024 | 11:10:19 | 41 | STRICKEN and REMOVED per 17 Order -- SETTLEMENT AGREEMENT by Genie Investments NV, LLC. (Faragalla, Michael) Modified on 6/26/2024 (IK). (Entered: 06/26/2024) | Settlement Agreement | |
| | 6/26/2024 | 11:10:19 | | | Settlement Agreement | |
| | 6/26/2024 | 16:35:11 | | | Order | |
| 17 | 6/26/2024 | | | ORDER: Doc. 16 is STRICKEN. The filing is improper because the case is closed. The Clerk is DIRECTED to remove Doc. 16 from the docket. Signed by Judge Anne C. Conway on 6/26/2024. (Conway, Anne) (Entered: 06/26/2024) | Order | |

**EXHIBIT H**

**DECLARATION OF DONALD W. KLEIN IN SUPPORT OF EMERGENCY**

**MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER**

**I,** Donald W. Klein, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

### I. PERSONAL BACKGROUND

1. My name is Donald W. Klein. I am over the age of eighteen (18), of sound mind, and competent to make this declaration.

2. I am the Plaintiff in this action. I make this Declaration in support of my Emergency Motion for Ex Parte Temporary Restraining Order ("TRO").

### II. FACTUAL BACKGROUND OF FRAUDULENT SCHEME

3. In March 2023, I was introduced to Joshua Matthew Wearmouth, who represented himself as an officer of Velanos Principal Capital Inc., a Canadian financial entity specializing in Standby Letter of Credit (SBLC) trading programs.

4. Wearmouth and Velanos promised that, if I invested $1,000,000 in an SBLC program managed through Nordic Trust Alliance KB, LLC, my funds would remain fully secured, and I would receive guaranteed returns within 30 days.

5. Relying on these representations, on April 25, 2023, I wired $1,000,000 USD from my personal Bank of America account in Dallas County, Texas to an account at Nordic Trust Alliance KB, LLC.

6. No SBLC was ever delivered. Instead, Defendants provided fabricated "compliance" documents and false assurances to delay and prevent recovery.

7. Beginning in October 2023, Defendants also made unauthorized monthly withdrawals of $25 from my account, further demonstrating ongoing control over my funds.

### III. PATTERN OF ENTERPRISE AND CONNECTION TO BYRD

8. I have since learned that Nordic Trust Alliance KB, Joshua Wearmouth, and James William Byrd were all named in federal lawsuits involving identical SBLC fraud schemes, including:

    o *Hantash v. Byrd*, Civil No. 3:24-cv-02392-D (N.D. Tex. 2024), where this Court granted TRO relief against Byrd and Nordic Trust for an identical SBLC program.

    o *Genie Investments NV v. Wearmouth*, No. 6:23-cv-00312 (M.D. Fla. 2023), which documents the same Nordic Trust/Wearmouth fraud enterprise.

9. Based on these pleadings and publicly available court records, I believe James William Byrd knowingly participated in the same SBLC enterprise, acting as an intermediary to layer or temporarily hold enterprise proceeds.

10. Byrd passed away in 2024. After his death, probate filings in Collin County, Texas (Estate of James W. Byrd) reflected unexplained deposits and property acquisitions during the same period as my $1,000,000 transfer.

## IV. ESTATE AND EXECUTOR RISK

11. The Estate of James W. Byrd now holds, directly or indirectly, assets traceable to the SBLC enterprise.

12. Defendant Lynda K. Byrd, as Independent Administrator of the Estate, owes fiduciary duties under Texas Estates Code § 351.101 to safeguard estate property. However, as an Independent Administrator, she has the authority to liquidate or distribute estate assets without prior court approval or notice to outside claimants like me.

13. Based on Byrd's prior role in the enterprise and the timing of these estate deposits, I believe my $1,000,000 investment—or its equivalent fraud proceeds—has been at least partially concealed within Byrd's estate accounts or property.

14. Without an immediate TRO and sworn accounting, Lynda Byrd could distribute or liquidate fraud proceeds from the estate, making it impossible for me to recover funds even if I ultimately prevail.

## V. IMMEDIATE NEED FOR TRO AND ACCOUNTING

15. Defendants are actively concealing or dissipating enterprise proceeds through offshore and probate channels.

16. The TRO I request is narrowly tailored to:

   o   Freeze assets traceable to my $1,000,000 investment, including estate property;
       and

   o   Compel an accounting of all accounts and transfers linked to Nordic Trust, Byrd,
       and the SBLC enterprise.

17. If this Court does not issue a TRO before notice is provided, there is a substantial risk
    that the enterprise, including the executor, will move or dissipate assets beyond reach of
    this Court.

## VI. CERTIFICATION OF NOTICE EFFORTS

18. I attempted to notify Defendants of my claims by email and telephone in March and April
    2024. All such communications were ignored.

19. Prior victims of Nordic Trust and Byrd (including Dr. Basil Hantash) have also
    experienced immediate asset flight upon notice of litigation.

20. Providing advance notice here would likely trigger the same concealment or dissipation,
    making relief moot.

## VII. CONCLUSION

21. Based on my personal knowledge, documentary evidence (Exhibits A–H), and public
    records, there is a substantial likelihood that:

      o   Byrd was part of the same SBLC enterprise;

      o   The Byrd estate holds proceeds traceable to my $1,000,000 investment; and

      o   Without emergency relief, those assets will be irretrievably lost.

22. I respectfully request that the Court grant the Emergency Motion for Ex Parte Temporary Restraining Order, freeze the relevant assets, and order a sworn accounting within seven (7) days.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Dated**: July 30, 2025

Respectfully submitted,

/s/ Donald W. Klein

Donald W. Klein, Pro Se

10380 Foutch Road

Pilot Point, TX 76258

Tel.: 469-237-7744

Email: dk@dwklein.com

## EXHIBIT I

**Affidavit Affirming No AI Usage in Legal Drafting**

(Donald W. Klein, July 29, 2025)

I, Donald W. Klein, declare under penalty of perjury as follows:

1. I am the Plaintiff in the above-captioned matter and appear pro se.

2. I affirm that all pleadings, motions, declarations, and exhibits submitted in this action —
   including but not limited to the Verified Complaint, Motion for Temporary Restraining
   Order, Brief in Support, Proposed Order, and this affidavit — were drafted, reviewed, and
   finalized exclusively by me, the Plaintiff, without reliance on automated artificial
   intelligence ("AI") tools for substantive legal drafting or filing.

3. Where assistance was sought, such input was limited to formatting, typographical review,
   and citation cross-checking only. All substantive arguments, legal strategy, and factual
   content reflect my personal knowledge, legal research, and handwritten or typed
   preparation.

4. This declaration is provided to comply with all applicable court rules and standing orders
   prohibiting or limiting AI-generated filings.

Executed this July 29, 2025, in Pilot Point, Texas.

Respectfully submitted,

/s/ Donald W. Klein

Donald W. Klein

10380 Foutch Road

Pilot Point, TX 76258

Tel.: 469-237-7744

Email: donald@dwklein.com